75075. DONALD H. GORDON COMPANY v. CARSWELL.
(362 SE2d 483)

BIRDSONG, Chief Judge.

Appellant Donald H. Gordon Company brings this appeal from judgment entered on a jury verdict for appellee Miriam Carswell. Wine-Art of America, a California corporation, issued a franchise to sell wine and beer making supplies in Georgia, Florida and Alabama, to Donald H. Gordon of Atlanta. Gordon incorporated the Donald H.

Gordon Company (Gordon Company). He was the sole stockholder and the president and opened a retail outlet in Atlanta under the name of Wine-Art Atlanta. He conducted mail-order sales throughout his assigned territory. Elyea Carswell met Gordon through purchases he made at Wine-Art. Gordon asked Carswell if he would be interested in investing in a similar franchise in the Carolinas. Carswell invested $7,500 in a Wine-Art franchise for North and South Carolina, called Carolina Winemakers (Carolina), in the name of his wife, Miriam Carswell. Mrs. Carswell lent Carolina $5,000 on a promissory note, secured by all equipment and inventory of Carolina. The note was signed by Philip Arnold, President of Carolina, for that corporation. Gordon invested in Carolina and was the vice president. Gordon's father also invested in the Carolina franchise and lent it $2,000, also by promissory note. The Carolina franchise did not fare well and at a stockholders' meeting in December 1973, all the officers and stockholders voted to cease operations and liquidate the inventory. Arnold was placed in charge of liquidating the inventory. Carolina owed Wine-Art of Atlanta around $600-700, and owed its suppliers from various locations, and promissory notes given to Wine-Art of California, to Gordon's father, and Mrs. Carswell.

Gordon testified that after the meeting was over he told the stockholders that most likely the Gordon Company would be doing some mail-order business in the Carolinas, "and if this mail-order business does pick up and continue, that the Donald H. Gordon Company would set aside the profits from the mail-order operation . . . and put it up into a [separate] account in the Donald H. Gordon Company . . . and then periodically I would divide this up based on the total financial amount put in by the stockholders, the shareholders and the note holders and disperse it out from this special account. . . ." Gordon said he specifically advised the stockholders: "I am not accepting this as a legal or moral obligation and that I'm going to work this out and try to cut our losses. . . ." He "would do the best [he] could."

The Carolina officers contacted the two malls in which they had retail outlets to terminate their leases. Gordon said "[t]hey agreed to cancel the lease or let us out of the lease if at the point of going out of business they took everything that was left in the store; chairs, decor, any inventory." The malls agreed to take Carolina's inventory and terminate the leases. A final report was submitted by Philip Arnold on the duties assigned him by the Carolina stockholders in which he stated he had disposed of the Carolina inventory by transfer to the mall, and he enclosed a letter from the mall they "had [him] sign turning over the inventory to them." This same document showed he disposed of the "truck and cash register," enclosed a receipt for a load of goods "with the money going toward our debt to the [m]all," the

taxes paid for sales tax, Federal and State withholding and unemployment taxes, W-2 to employees, cancelled checks, checking accounts, refunds from cancellation of insurance policies, etc. In short, the Carolina president made a final business report of disposition of all assets, including the inventory, and payment of liabilities, in accordance with his authorization from the Carolina stockholders. Carolina ceased operations in January 1974. After Carolina had been liquidated, Arnold drove to the Atlanta Wine-Art store and brought "two or three boxes of merchandise. . . . There was several bags of elderberries, a few dented cans of malt. It was basically miscellaneous junk that he had brought down. They had some questionable value . . . at the most . . . a hundred dollars," but Carolina owed Wine-Art between $600 and $700. Gordon stated that those few boxes of merchandise were the only assets Wine-Art received. Sandra Essom, Secretary-Treasurer of Carolina Winemakers, was the manager of the Carolina retail store and "to [her] knowledge there weren't any assets" of Carolina left over.

Miriam Carswell said that Sandra Essom had told her, at some unknown date, that the Carolina inventory had been transferred to the Gordon Company and "Don Gordon admitted it." Essom could not remember telling Mrs. Carswell that the inventory had been transferred. Neither party asked Gordon if he had told Mrs. Carswell he had the inventory of Carolina sent to his store in Atlanta. Mr. Carswell also testified that Sandra Essom told him the Carolina inventory had been transferred to the Atlanta Wine-Art store.

During the period from 1974 to 1980, Mrs. Carswell received checks from Wine-Art Atlanta signed by Don Gordon, in an amount totalling approximately $5,050. Gordon testified that he made such payments to all stockholders and specially to the note holders from profits on mail-order sales to the Carolinas. The suppliers to Carolina Winemakers had been paid from the general operating funds of the Gordon Company. In 1980 Gordon and his wife separated, and he transferred all his shares and complete control over Gordon Company to her and left Atlanta.

Mr. Carswell testified that the checks received by his wife from 1974 to 1980 never indicated whether they were dividends from the Carolina operation or payments made on the promissory note. He was "trying to find out what was going on, how come, you know . . . these checks had come in from 1974 until 1980 in various odd amounts, to see what was going on. . . . I found out [Gordon] had left Atlanta." Carswell wrote Gordon and set up a meeting, attended by Mr. and Mrs. Carswell, Mr. and Mrs. Gordon and Sandra Essom. Carswell testified that at the meeting in May 1980, he found out Mrs. Gordon was the sole owner of Gordon Company and she "became quite hysterical. . . . She knew she owed me the money; that the inventory was

there. She said she intended to pay it but she [would] have to put a second mortgage on her house. They were getting a divorce." Carswell said he told her if they could "get an agreement . . . you can pay me along . . . I had an agreement drawn which they refused to sign. . . . Ever since they made the agreement they haven't paid me one dime. . . ." Mrs. Gordon denied that she had told Mr. Carswell that the Carolina inventory had been transferred to the Atlanta Wine-Art store.

Mrs. Carswell filed this action on the promissory note, asking for payment of principal, interest and attorney fees, alleging that Carolina's assets were turned over to the Gordon Company and that she had received payments from defendant in the amount of $1,525 on the note since 1974. Gordon's answer alleged that the agreement between the parties was a parol agreement to answer for the debt of another and was neither in writing nor signed by Gordon or any person authorized to do so. Gordon's motions for summary judgment and directed verdict were denied. The jury returned a verdict for Carswell for the amount of the note, plus interest and attorney fees, minus the payments made by Gordon on the note in the amount of $1,525. The trial court made the jury verdict its judgment and the Gordon Company brings this appeal. *Held*:

1. Appellant Gordon Company enumerates as error denial of its motion for directed verdict. "If there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict, such verdict shall be directed." OCGA § 9-11-50 (a). However, mere conflicts in the evidence will not render direction of a verdict erroneous when it appears the conflicts are not material. *Blalock v. Central Bank of Ga.*, 170 Ga. App. 140 (2) (316 SE2d 474).

The statute of frauds, OCGA § 13-5-30 (a) makes an obligation to answer for the debt of another binding on a promisor only when it is in writing and signed by the party to be charged, or by some person authorized by him. For such promise to pay the existing debt of another to come within the proscription of the statute, it must be one which is collateral or secondary, and is merely superadded to the existing promise. *Scott Hudgens Realty v. Executive Action*, 125 Ga. App. 81, 82 (186 SE2d 504). However, a promise to pay the debt of another which is an original undertaking by which the promisor becomes liable is not within the statute. Id. Stated differently, those promises required by the statute to be in writing do not include an original undertaking in which the new promisor, for valuable consideration, *substitutes himself* as the party who is to perform and the *original promisor is released. State Hwy. Dept. v. Eagle Constr. Co.*, 125 Ga. App. 678, 680 (188 SE2d 810). Our appellate courts have also construed OCGA § 13-5-31 as mandating removal of an oral promise

from the constraints of the statute of frauds when there has been such part performance of the oral promise as would render it a fraud upon the promisee because of the promisor refusing to comply. *Smith v. Cox*, 247 Ga. 563, 564 (277 SE2d 512).

Hence, at issue in the instant appeal is whether (a) the oral statements by the officers of Gordon Company were in fact and law to answer for the debt of Carolina and if so constituted an original or a collateral undertaking, (b) if the oral promises of those officers were within the statute of frauds, whether the part performance by Don Gordon in making periodic payments to the note holders and shareholders remove the oral promise from the constraint of the statute of frauds, and (c) whether the conflicts in the evidence are material.

Carswell's basis for recovery is twofold: (1) this was an original undertaking because of new consideration, i.e., the transfer of the Carolina inventory to the Gordon Company and that Mrs. Carswell had not foreclosed the promissory note, which was secured by the assets of Carolina, and such forbearance was additional consideration, and (2) even if it was a collateral undertaking, partial performance by Gordon in making periodic payments removed the promise from the Statute of Frauds.

At the outset, we should note that there was *no agreement* reached at the December 1973 meeting of the officers and shareholders of Carolina as to payment of the Carswell note. The minutes of that meeting show that it was decided to cease operations and liquidate the inventory. The oral statement of Gordon following the meeting was to the effect that he "would do the best [he] could" to "try to cut [their] losses," but Gordon specifically refused to "accept[ ] this as a legal or moral obligation. . . ." These statements are not refuted nor is there any evidence to the contrary found in the record.

" 'Where a creditor, his debtor, and a third person who owes the debtor agree in parol that such third person shall be substituted for the debtor and that the latter shall be released, the case is not within the statute of frauds, so as to require the agreement to be in writing, but the debt is extinguished as to the debtor, and the third person becomes, by substitution, the debtor in his place.' [Cits.] In order, therefore, to take such a transaction without the operation of the statute of frauds, it must appear that the person substituted for the debtor was, by agreement between the creditor, the debtor, and himself, substituted for the original debtor, who was released from the promise. In other words, it must be shown that the person substituted as the debtor in the place of the person released, became such as the result of an agreement in which all three concurred." *Palmetto Mfg. Co. v. Parker & Anderson*, 123 Ga. 798, 800 (51 SE 714). In the case at bar there was no agreement, there was no release of the original debtor, Carolina, by Mrs. Carswell. There was no agreement to substi-

tute the Gordon Company for Carolina nor to look solely to Gordon Company for complete payment of the notes. Accordingly, the oral statement of Gordon at the December 1973 meeting of Carolina stockholders came within the statute of frauds as it related to the payment of the debt of another and was required to be in writing to be enforceable.

Was there a forbearance by Mrs. Carswell to foreclose the note against Carolina? There is no evidence relating to forbearance of Mrs. Carswell to foreclose the note against Carolina which arose from the December 1973 meeting. In fact just the opposite was voted by the stockholders. They voted to dissolve the corporation and liquidate the inventory and placed execution of such plan in the hands of its president, Philip Arnold. No action was taken to pay any of the note holders of the corporation. Any claim of forbearance to foreclose on the Carswell note was not involved in any agreement or promise by Gordon to make payments to the shareholders and note holders of Carolina. The corporation was then non-existent and the collateral had been liquidated. Hence, this claim of forbearance to foreclose the Carswell note is not consideration for the undertaking of Gordon in his oral statement to make payments to the shareholders and note holders of Carolina at the December 1973 meeting.

Was the claimed transfer of inventory from Carolina to the Gordon Company consideration for Gordon's undertaking to make it an original undertaking as opposed to a collateral promise? There was no agreement on the transfer of any inventory from Carolina to Gordon Company arising from the December 1973 meeting. It was agreed that all inventory would be sold at reduced prices and the remainder transferred to the malls in which Carolina had two outlet stores. The malls agreed to accept the furnishings and inventory as consideration of cancellation of the leases. And, according to the business records furnished as an accounting by Carolina's president to its vice-president, Gordon, such liquidation was accomplished in accordance with the minutes of the last meeting of the Carolina stockholders. Gordon also testified to Carolina's debt to Gordon Company ($600-700), and that without his knowledge, Arnold came to the Wine-Art store in Atlanta after Carolina had been closed out and gave him the remaining three boxes of inventory, the only inventory received, which had an approximate value of $100. There is no evidence of record that any transfer of inventory had any relationship to Gordon's statement made to the Carolina stockholders at the 1973 meeting.

As hereinbefore indicated the promise to answer for the debt of another required by the statute of frauds to be in writing to be enforceable relates to the collateral promise of the second promisor to become bound along with the original promisor. It does not include

an original undertaking whereby a new promisor, for a valuable consideration between him and the promisee, substitutes himself as the party who is to perform, thus causing the original promisor to be released from the contract. *Evans v. Griffin*, 1 Ga. App. 327, 328 (57 SE 921). When the promise to be answerable for the debt of another is based upon a new consideration which moves to and benefits the promisor, the obligation is his own debt and the original promisor is relieved of his obligation. *Thomason v. Pease Co.*, 47 Ga. App. 776 (171 SE 467). Whether a promise to assume the debt of another is an original undertaking or a collateral one, "the question is one of intent and whether the parties meant for the promisor to stand in the place of the third party." *Lewis v. Dan Vaden Chevrolet*, 142 Ga. App. 725, 729 (236 SE2d 866). In this appeal there is no evidence that Carolina's inventory had anything to do with Gordon's statement at the 1973 meeting, nor is there any evidence of any consideration for the statement "to cut losses," nor is there any evidence of the intent of Carolina and Carswell to substitute Gordon Company for Carolina or to release Carolina from its obligation on the Carswell note. Hence, any conflict in the evidence as to the possible subsequent transfer of Carolina's inventory is not material to the issue of new consideration for Gordon's prior statement made at the 1973 stockholders' meeting.

In summary, the oral statement of Gordon at the 1973 meeting of Carolina's stockholders was not to answer for the debt of Carolina, but even if construed to be a promise to answer for the debt of Carolina, the statute of frauds required it to be in writing to be enforceable. Secondly, any claim of subsequent movement of inventory cannot be considered as consideration for the former statement made by Gordon at the 1973 meeting. The subsequent but inconsequential movement of Carolina's inventory to Gordon Company may be the basis for an action based on conversion, but it cannot relate back to events that occurred before its transfer, to act as consideration for an alleged promise. There is no evidence of record that there was any forbearance by Mrs. Carswell to enforce her promissory note as consideration for Gordon's statement at the 1973 meeting. To the contrary, Mr. Carswell voting for Mrs. Carswell, and the shareholders, voted to liquidate the corporation and made no arrangements to pay the note holders.

This leaves as an unresolved issue the claim of partial payment by Gordon Company to Carolina stockholders and note holders from 1974 to 1980 as to whether they are sufficient to take Gordon's statement out of the statute of frauds.

Partial but voluntary payment alone is insufficient to take a case out of the statute of frauds. *Smith v. Cox*, 247 Ga. 563, 564 (277 SE2d 512). As the Gordon Company was not legally bound to pay any portion of the Carswell note, the voluntary contribution to Carolina's

debtors furnished no legal basis for enforcing payment of the note or its residue. *McGaughey Bros. v. Latham*, 63 Ga. 67, 71 (1). No fraud was committed by the partial payments since the Gordon Company was not legally bound to pay the Carswell note by the oral statements made by Gordon at the 1973 meeting and " '[i]t would surely be bad logic to say, that whoever, in pursuance of a void promise, voluntarily pays part of a debt, is thenceforth under a binding contract to pay the balance.' " *Trans-State v. Barber*, 170 Ga. App. 372, 375 (317 SE2d 242).

2. Remaining for discussion is the May 1980 meeting between Mr. and Mrs. Gordon and Mr. and Mrs. Carswell. At that meeting, it was established that Mrs. Gordon was the sole owner of Gordon Company and her husband had left Atlanta and was no longer a part of the company. The Carswells said Mrs. Gordon admitted the transfer of the inventory from Carolina to Gordon Company and that she owed them "the money." This was denied by Mrs. Gordon. Mr. Carswell testified that an agreement was prepared for the signature of the Gordons but was never signed. The alleged oral statement of Mrs. Gordon was also one to answer for the debt of another, Carolina's debt on the Carswell note, and was also subject to the statute of frauds' requirement that it be in writing and signed. Further, there were no partial payments made after that meeting. As Mr. Carswell admitted, "they haven't paid me one dime. . . ."

Any claim of consideration based on the alleged transfer of inventory following the 1973 meeting could not act as consideration for the oral promise of Mrs. Gordon in 1980 when, the execution of the note by Carolina preceded the subsequent promise of Mr. Gordon, and the alleged transfer of inventory followed the Gordon statement, and the subsequent transfer of the Gordon Company to Mrs. Gordon preceded her subsequent promise to the Carswells in May 1980. The debt on the Carswell note was that of Carolina, and as held above, did not become the debt of the Gordon Company prior to the 1980 meeting. "[A] promise to pay the pre-existing debt of another, without any detriment or inconvenience to the creditor [Carswell], or any benefit . . . to the debtor [Carolina] in consequence of the undertaking . . . is mere *nudum pactum*." *Davis v. Tift*, 70 Ga. 52, 56. No benefit accrued to Carolina by this alleged promise. No benefit accrued to the promisor not already in existence prior to the alleged promise. There was no detriment or inconvenience to the Carswells by the making of the alleged promise of Mrs. Gordon in May 1980. Their legal position following the alleged promise was not adversely affected. Any claim of forbearance to foreclose the note is unavailing. The note was against Carolina and its assets. That corporation and its assets were extinguished in 1974, and neither was in existence in 1980. Even if the amount of the alleged transfer of inventory extinguished the $600-700

debt owed by Carolina to the Gordon Company, with an excess amount left over, Carswell would only be entitled to an accounting (see *Gandy v. Robinson Co.*, 216 Ga. 190 (115 SE2d 341)), and an action for an accounting must be brought within four years (1978). OCGA § 9-3-25. "Nor can the [Carswells] rely on the naked promise of [Mrs. Gordon] to do an act as a 'consideration' where there is no contract between the promisee and the promisor." *Insilco Corp. v. First Nat. Bank*, 156 Ga. App. 382, 383 (274 SE2d 767), rev'd on other grounds 248 Ga. 322 (283 SE2d 262); *Trust Co. of Columbus v. Rhodes*, 144 Ga. App. 816, 818 (242 SE2d 738).

At best, the meeting between the Gordons and the Carswells resulted in an oral promise by Mrs. Gordon to sign a subsequent agreement, which the Gordons ultimately refused to sign. A parol agreement to contract is not an enforceable contract. *John Bleakley Ford v. Estes*, 164 Ga. App. 547, 548 (298 SE2d 270); *Hartrampf v. C & S Realty Investors*, 157 Ga. App. 879, 881 (278 SE2d 750).

3. There being no enforceable agreement between the parties to answer for the debt of another, i.e., the debt of Carolina on the Carswell note, the trial court erred in denying appellant's motion for directed verdict.

*Judgment reversed. Pope, J., concurs. Deen, P. J., concurs in judgment only.*

DECIDED NOVEMBER 2, 1987.

*Mathew Robins, H. Martin Huddleston*, for appellant.
*Douglas A. Hill*, for appellee.