A91A1579, A91A1580. WHITE HOUSE, INC. v. WINKLER; and
vice versa.
(415 SE2d 185)

COOPER, Judge.

Marvin Winkler ("Winkler"), a California resident, is an officer and shareholder of a California corporation, American Marketing Works, Inc. ("American"). American purchases T-shirts and other apparel for retail sale on a nationwide basis. This suit was brought by The White House, Inc. ("White House"), a Georgia T-shirt manufacturer, for monies owed as a result of an unpaid purchase order. White House alleges that when the purchase order at issue was submitted to White House, Winkler was advised that the order would not be accepted unless Winkler and his wife executed personal guaranties. White House contends that Winkler agreed to provide both guaranties, however requested that production begin prior to executing the guaranties since Winkler had already contracted to sell the T-shirts. According to White House, Winkler said that he had to have the goods immediately; that White House should not worry; and that Winkler would absolutely make sure that White House got paid. Thereafter, White House began production of the T-shirts and incurred out-of-pocket expenses of approximately $346,000. The purchase order was not paid; Winkler and his wife refused to execute the guaranties; and White House filed suit against American and Winkler, personally. American subsequently filed for bankruptcy, and the trial court issued an order administratively terminating the case against American, yet allowing the case to proceed against Winkler. Winkler filed a motion to dismiss for failure to state a claim upon which relief could be granted and for lack of personal jurisdiction. To support his motion, Winkler submitted his own affidavit and in response, White House submitted the affidavit of its president. The trial court denied Winkler's motion to dismiss for lack of personal jurisdiction but dismissed the case for White House's failure to state a claim upon which relief could be granted. In the main case, Case No. A91A1579, White House appeals the grant of the motion to dismiss, and in Case No. A91A1580, Winkler's cross-appeal, he challenges the court's denial of the motion to dismiss on the jurisdictional ground. We address the cross-appeal first.

*Case No. A91A1580*

In his affidavit, Winkler stated that he has always been a resident

of California; that he has never been a resident of nor has he ever visited Georgia; that he has never transacted business or personally solicited business in Georgia; that he owns no property in Georgia; and that his only contact with White House with regard to the instant allegations was one telephone conversation with the president of White House and the receipt by mail of correspondence from the president, to which Winkler never responded. The affidavit submitted by White House stated that White House has done business with American since 1986 and has often dealt directly with Winkler acting on behalf of American; that Winkler represented to White House that he was Chairman of the Board and President of American and that he and his wife together had a controlling shareholder interest in American; and that the purchase order and subsequent transaction were completely unsolicited by White House but were initiated solely by Winkler. As these affidavits create, on their faces, factual issues, the trial court properly held a hearing on the motion to dismiss for lack of personal jurisdiction to resolve the factual disputes and legal questions presented. "[J]urisdiction is a question for the court. [Cit.]" *Terrell v. Porter*, 189 Ga. App. 778, 779 (1) (377 SE2d 540) (1989).

"Georgia's Long Arm Statute states that the courts of this State may exercise personal jurisdiction over any nonresident as if he were a resident of the State, if in person or through an agent he: '1) Transacts any business within this State. . . .' This has been interpreted to mean that 'purposeful acts' must have been performed by the defendant to tie it to the State. . . ." *Mayacamas Corp. v. Gulfstream Aerospace Corp.*, 190 Ga. App. 892, 893 (1) (380 SE2d 303) (1989). See OCGA § 9-10-91 (1). " ' "Where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, . . . the defendant (must have) 'purposefully directed' his activities at residents of the forum, (cit.), and the litigation (must result) from alleged injuries that 'arise out of or relate to' those activities. (Cit.)" (Cit.)' [Cit.] '(T)he constitutional touchstone (is) whether the defendant purposefully established "minimum contacts" in the forum State . . . "(that is, whether) the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." (Cit.)' [Cit.]" *Signet Bank/Virginia v. Tillis*, 196 Ga. App. 433, 435 (396 SE2d 54) (1990). " '[M]ere telephone or mail contact with an out-of-state defendant . . . is insufficient to establish the purposeful activity with Georgia required by the "Long Arm" statute. (Cit.)' [Cit.]" *Mayacamas Corp.*, supra at 893. Also, " '[a]n individual's contract with an out-of-state party alone (cannot) automatically establish sufficient minimum contacts. . . . [Cits.]' '(P)rior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing . . . must be evaluated in determining whether the

defendant has purposefully established minimum contacts within the forum.' [Cit.]" *Tillis*, supra at 435.

The trial court found that Winkler's contact with White House was not initiated solely by White House; that Winkler and White House entered into bilateral negotiations designed to "work out" a deal for the purchase of the goods; that Winkler and White House negotiated over the terms of payment, specifically the issue of a personal guaranty from Winkler; that Winkler's conduct was much more than unilateral mail or telephone contacts; that Winkler actively participated in dealings with White House such that his actions were purposeful; that Winkler created continuing obligations between himself and White House; that Winkler, who was president and principal shareholder of American, made promises that induced White House to commence manufacturing the products; and that requiring Winkler to appear in Georgia would not offend traditional notions of fair play and substantial justice. We find ample evidence in the record to support the trial court's findings and conclusions. See *Terrell*, supra; *Montgomery v. USS Agri-Chemical Div.*, 155 Ga. App. 189 (1) (270 SE2d 362) (1980). We conclude, as did the trial court, that Winkler was far from being a passive party, compare *Tillis*, supra at 436, but instead knowingly and "purposefully did an act or acts and consummated a transaction or transactions within the state, so as to establish legally sufficient contacts." *Georgia R. Bank &c. Co. v. Barton*, 169 Ga. App. 821, 824 (315 SE2d 17) (1984). Given Winkler's consistent and purposeful personal dealings with the Georgia corporation, dealings which bestowed substantial benefits to Winkler and induced substantial action by White House to its detriment, "neither reasonableness nor fair play nor substantial justice would be offended" by haling Winkler into a Georgia court and exercising jurisdiction over him. See *Barton*, supra; compare *Tillis*, supra. The trial court did not err in denying Winkler's motion to dismiss for lack of personal jurisdiction.

### Case No. A91A1579

In the main appeal, White House asserts that the trial court erred in granting Winkler's motion to dismiss for failure to state a claim, citing the court's failure to find that White House stated claims for breach of contract, promissory estoppel and fraud. Without making a determination on the promissory estoppel and fraud claims, the trial court determined with regard to the breach of contract claim, that White House did not present evidence of an original undertaking of Winkler but instead showed evidence of an oral collateral promise that was proscribed by the statute of frauds. See OCGA § 13-5-30. At the outset, we note that, despite the trial court's statement that it was considering a motion to dismiss, the motion was supplemented by af-

fidavits of the parties and matters outside the pleadings and was therefore converted into a motion for summary judgment. OCGA § 9-11-12 (b). Thus, Winkler's "burden upon a motion for summary judgment was to make an affirmative showing that there was no genuine issue as to any material fact and that [he] was entitled to judgment as a matter of law. [Cit.]" *Davidson v. American Fitness Centers*, 171 Ga. App. 691, 693 (2) (320 SE2d 824) (1984). " 'The cardinal rule of the summary (judgment) procedure is that the court can neither resolve facts nor reconcile the issues but only look to ascertain if there is an issue. (Cit.)' [Cit.] ' "(T)he party opposing the motion is to be given the benefit of all reasonable doubts and all favorable inferences that may be drawn from the evidence." ' [Cit.]" *Powell v. Ferreira*, 198 Ga. App. 465 (402 SE2d 85) (1991). The affidavits submitted by the parties first reveal that there is a material issue of fact to be resolved by a jury. Winkler states in his affidavit that he never agreed to provide a personal guaranty to anyone at White House, whereas the affidavit of White House's president states that Winkler did agree to give the personal guaranties of himself and his wife, as well as personally assuring that White House would get paid. The true nature of the communication that occurred between the parties is a question for the factfinder. Nevertheless, our analysis does not end with this factual issue. We must further determine, and Winkler's motion for summary judgment depends upon, whether, assuming the existence of the alleged promise of Winkler, any issues exist with respect to any of White House's three theories of recovery. If any such issues do exist, Winkler's motion should have been denied.

As to White House's breach of contract theory, the statute of frauds does not apply to "an original undertaking whereby a new promisor, for a valuable consideration between him and the promisee, substitutes himself as the party who is to perform, thus causing the original promisor to be released from the contract." *Donald H. Gordon Co. v. Carswell*, 184 Ga. App. 701, 706-707 (362 SE2d 483) (1987). However, we agree with the trial court that all the evidence presented by White House in the record does not support the conclusion that the alleged promise by Winkler was an original undertaking such that American was released from liability and White House looked only to Winkler for payment. "It is true that statements such as 'I'll see that he gets paid' and words to that effect [cit.] are ordinarily indicative of an original undertaking, but the question is one of intent and whether the parties meant for the promisor to stand in the place of the third party. Here there is nothing to show that the agreement contemplated that [Winkler] would be primarily liable to [White House]." *Lewis v. Dan Vaden Chevrolet*, 142 Ga. App. 725, 729 (236 SE2d 866) (1977). There is no evidence that Winkler made a statement that he would be personally responsible for the bill, that he

personally would pay the bill or that the bill would be paid out of his personal funds. "[T]he agreement was that [Winkler] was 'guaranteeing' the payment, not assuming the obligation as an original undertaking." Id. Thus, White House has not presented sufficient evidence to create an issue for recovery based upon an original undertaking of Winkler.

However, White House also raised before the trial court its argument that the statute of frauds is inapplicable because White House has partially performed the contract such that it would work a fraud of Winkler if performance were not compelled by the court. OCGA § 13-5-31. "Partial performance which will vitiate the statute of frauds must be 'substantial and essential to the contract and which results in a benefit to one party and a detriment to the other.' [Cits.]" (Punctuation omitted.) *Zappa v. Basden*, 188 Ga. App. 472, 476 (373 SE2d 246) (1988). White House alleges that Winkler agreed to guaranty payment in return for White House's acceptance of the purchase order and White House's agreement to commence production. Winkler benefitted by White House's acceptance of the purchase order because Winkler had allegedly already contracted to sell the goods to another party. White House commenced production pursuant to its agreement with Winkler resulting in substantial monetary detriment to White House. " 'It is a question for the jury as to whether there was part performance when the evidence tends to prove such performance. [Cits.]' [Cit.]" *Smith v. Cox*, 247 Ga. 563, 565 (277 SE2d 512) (1981). We conclude that the issue of part performance in the instant case is one for the jury.

White House also has produced sufficient evidence to create issues of fact for the jury on the questions of promissory estoppel and fraud. " 'A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.' OCGA § 13-3-44 (a)." *Knotts Landing Corp. v. Lathem*, 256 Ga. 321, 324 (3) (348 SE2d 651) (1986). " ' "While fraud cannot generally be based on instances of misrepresentations as to future events, it may consist of such instances if, when the misrepresentation is made, the defendant knows that the future event will not take place." (Cits.)' [Cit.]" *Hines v. Good Housekeeping Shop*, 161 Ga. App. 318 (3) (291 SE2d 238) (1982). As this case presents several issues for the jury, the trial court erred in dismissing the complaint, and in effect, granting summary judgment to Winkler.

*Judgment reversed in Case No. A91A1579. Judgment affirmed in Case No. A91A1580. Birdsong, P. J., and Pope, J., concur.*

DECIDED JANUARY 28, 1992.

*Gingold, Kaufman & Chaiken, Robert J. Kaufman, Fredric Chaiken*, for appellant.

*Glass, McCullough, Sherrill & Harrold, R. Phillip Shinall III*, for appellee.