A98A1848. SES INDUSTRIES, INC. et al. v. INTERTRADE PACKAGING MACHINERY CORPORATION.

(512 SE2d 316)

ANDREWS, Judge.

SES Industries, Inc., a Georgia corporation using the trade name Southeastern Steam, Inc. (Southeastern), appeals from the trial court's dismissal of its breach of contract suit against Intertrade Packaging Machinery Corporation (Intertrade) for lack of personal jurisdiction.[1]

On November 4, 1994, Southeastern filed its complaint seeking payment for a steam pressure reducing station manufactured by it in Ambrose, Georgia for Intertrade. On December 16, 1994, Intertrade filed its answer asserting lack of personal jurisdiction over Intertrade and a counterclaim for damages for negligent manufacture of the station. Southeastern filed numerous discovery requests, including Requests for Admissions, to which no responses were made, even though Intertrade had joined in a joint motion for extension of discovery. Southeastern's motion for summary judgment was filed on January 15, 1997. On September 25, 1997, the affidavit of Salh Kahn, President of Intertrade, was filed, denying that Intertrade did business in Georgia, and on October 6, Intertrade's motion to dismiss was filed. It was granted on April 2, 1998.

" ' "(A) defendant who files a motion to dismiss for lack of personal jurisdiction has the burden of proving lack of jurisdiction. (Cits.)" *Scovill Fasteners v. Sure-Snap Corp.,* 207 Ga. App. 539 (428 SE2d 435) (1993). "If the motion is decided on the basis of written submissions alone, as was the motion in this case, disputes of fact found in the affidavits are resolved in favor of plaintiff. (Cit.) Further, if a motion is decided on the basis of the written submissions, the reviewing court is in an equal position with the trial court to determine the facts and therefore examines the facts under a non-deferential standard. (Cits.)" Id. at 540.' *Habersham Metal Products Co. v. Huntsville Fastener &c.,* 216 Ga. App. 646 (455 SE2d 356) (1995)." *Southern Electronics Distributors v. Anderson,* 232 Ga. App. 648 (1) (502 SE2d 257) (1998).

So viewed, the evidence here was that in December 1993, James Sowell III (Sowell) was the plant manager for Intertrade, an Ohio

---

[1] No brief has been filed by appellee Intertrade.

corporation, at its Cheraw, South Carolina facility. As such, Sowell oversaw daily plant operations, developed vendor contacts, coordinated parts acquisition and shipment, inspected equipment, and supervised personnel.

Sowell had full authority to contract on behalf of Intertrade and to act as its binding agent and representative. In that capacity, on December 8, 1993, he telephoned Glen Moorman, Jr. at Southeastern's Ambrose location and asked if Southeastern would construct a steam pressure reducing station for purchase by Intertrade and use in another project.[2]

During that conversation, Sowell requested that Moorman provide a cost estimate of such a station. Sowell further advised that time was of the essence and Intertrade needed the station as soon as possible. Moorman then prepared a rough sketch of the design discussed with Sowell and faxed it and an accompanying memo quoting a price of $4,750 to him on December 13. That same day, Sowell faxed back to Moorman in Ambrose a more detailed drawing of the station, including relevant specifications and the materials Sowell wanted used in the construction, and asking for a quotation on such a design. On December 14, Moorman faxed a quote of $10,850 to Sowell, in response to which Sowell faxed back that same day a revised drawing and set of specifications, on which a number of valves, strainers, regulators, and pipes were slightly reduced in size.

On December 14, Sowell and Moorman, on behalf of their respective companies, agreed that Southeastern would construct the station as specified by Sowell for Intertrade for the reduced price of $8,850. Sowell then faxed to Moorman a purchase order for the station. On December 15, Sowell and Moorman spoke by phone and discussed using three-inch instead of four-inch stop valves and that adjustment was made in Intertrade's specifications. That day, Moorman issued a work order and the station was built pursuant to Sowell and Intertrade's specifications.

On December 20, Southeastern informed Sowell the station was complete and Sowell traveled to Ambrose to pick up the station for Intertrade on December 21. Prior to Sowell's arrival, Southeastern conducted a successful pressure test on the station. Upon his arrival, Sowell conducted a thorough visual inspection of the completed station and determined that it complied with the specifications he had provided to Moorman.

Sowell then signed Southeastern's completed sales order and left

---

[2] In fact, the station was to be used in the remanufacture of a bottling line at a micro-brewery in South Africa. Southeastern was not aware of the location of the project and such lack of knowledge was customary in the industry, since the equipment can be manufactured without such information.

the Ambrose facility with the station and returned to South Carolina with it. It was then shipped to South Africa.

The affidavits of Sowell and Moorman were submitted on behalf of Southeastern in support of its motion for summary judgment. In support of Intertrade's motion to dismiss, only Khan's affidavit was submitted. In it, he stated that Intertrade was "a business corporation organized and existing under the laws of the State of Ohio, with its principal office and place of business located at . . . Cincinnati, Ohio. . . . IPMC has not applied for nor obtained a certificate of authority from the Secretary of State of the State of Georgia to transact business in Georgia." Additionally, it stated that during the incidents related above, "IPMC was not engaged in manufacturing or remanufacturing projects in the State of Georgia. IPMC was not otherwise transacting business in the State of Georgia at the time suit was filed in this action. . . ."[3]

"We have consistently held that our Long-Arm Statute confers jurisdiction over nonresidents to the maximum extent permitted by due process. *Coe & Payne Co. v. Wood-Mosaic Corp.*, 230 Ga. 58 (195 SE2d 399) (1973)." *First United Bank of Mississippi v. First Nat. Bank of Atlanta*, 255 Ga. 505, 506 (340 SE2d 597) (1986).

" 'Due process requires that individuals have "fair warning that a particular activity may subject them to the jurisdiction of a foreign sovereign." (Cit.) In evaluating whether a defendant could reasonably expect to be haled into court in a particular forum, courts examine defendant's contacts with the state, focusing on whether (1) defendant has done some act to avail himself of the law of the forum state; (2) the claim is related to those acts; and (3) the exercise of jurisdiction is reasonable, that is, it does not violate notions of fair play and substantial justice. (Cits.) These three elements do not constitute a due process formula, but are helpful analytical tools which ensure that a defendant is not forced to litigate in a jurisdiction solely as a result of "random," "fortuitous" or "attenuated" contacts. (Cit.) The first two elements are used to determine whether defendant has established the minimum contacts necessary for the exercise of jurisdiction.' *Beasley v. Beasley*, 260 Ga. 419, 421 (396 SE2d 222) (1990). See OCGA § 9-10-91." *Southern Electronics Distributors*, supra at 649-650.

The cases cited below by Intertrade and relied upon by the trial court in dismissing the complaint were *O. N. Jonas Co. v. B & P Sales Corp.*, 232 Ga. 256 (206 SE2d 437) (1974) and *Irving Commercial Corp. v. Sound Floor Coverings*, 595 FSupp. 536 (N.D. Ga. 1984) (per-

---

[3] The latter statement regarding transacting business is conclusory and adds little to the evaluation of the issue. See *Miller v. Calhoun/Johnson Co.*, 230 Ga. App. 648, 650 (3) (497 SE2d 397) (1998).

suasive authority only). Both cases are factually distinguishable from the present situation. In *O. N. Jonas Co.*, the only contact by the out-of-state entity was a visit to the Georgia manufacturing plant and shipment out of state of apparently standard goods by plaintiff FOB the Georgia shipping point. In *Irving Commercial Corp.*, a Georgia factor had obtained a Georgia corporation's (Sweetwater) account with Sound Floor as a result of Georgia carpet sold to it. The only contacts were visits by the defendant to Georgia trade fairs where many manufacturers displayed carpet, one visit to Sweetwater's mill, and the resulting sale of carpet which was transported by Sound Floor's trucking subsidiary which, incidentally, had a Georgia motor carrier certificate of authority.

The present situation is factually more similar to and controlled by *White House, Inc. v. Winkler*, 202 Ga. App. 603 (415 SE2d 185) (1992) and the cases cited therein. There, Winkler, a California resident and officer of a California corporation, American Marketing, submitted a purchase order to White House, a Georgia T-shirt manufacturer, for a large quantity of shirts. Told that White House required personal guarantees by Winkler and his wife, Winkler agreed to provide them, but requested production begin because he had already contracted to sell the shirts. He also assured White House it would be paid. White House began production and incurred $346,000 in expenses for which it was not paid.

This Court found that, because the purchase order was initiated solely by Winkler, unsolicited by White House, and Winkler had dealt with White House previously by phone and letter, there had been purposely established those minimum contacts that were required so that requiring Winkler to appear in Georgia would not offend traditional notions of fair play and substantial justice. Also important were bilateral negotiations conducted by Winkler and White House to work out the deal.

Here, similarly, Sowell initiated contact with Southeastern and a concentrated period of negotiations occurred concerning the exact specifications of the custom-made piece of equipment being sought by Intertrade. The station was then built on an accelerated schedule to those specifications and Sowell traveled to the plant for the purpose of inspecting the station and finalizing the contract. He then signed the final sales order at the Ambrose facility.

We conclude that there was personal jurisdiction over Intertrade and the trial court's order is reversed. *Habersham Metal Products*, supra; *White House*, supra; see also *Electronic Transaction Network v. Katz*, 734 FSupp. 492 (N.D. Ga. 1989).

*Judgment reversed. Beasley, P. J., and Ruffin, J., concur.*

DECIDED FEBRUARY 11, 1999.

*Mixon & Mixon, Warren L. Mixon,* for appellants.
Salh F. Khan, *pro se.*