[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 15, 2004
THOMAS K. KAHN
CLERK

No. 03-11169

D. C. Docket No. 00-00195 CV-AAA-1

CLUB CAR, INC.,

Plaintiff-Counter
Defendant-Appellee,

versus

CLUB CAR (QUEBEC) IMPORT, INC.,

Defendant-Counter
Claimant-Appellant,

MARTIN MURPHY,

Defendant-Appellant,

PIERRE CHAMPIGNY,
EQUIPMENTS PIERRE CHAMPIGNY, LTD.,

Counter-Defendants-
Appellees,

INGERSOLL RAND CO., LTD.,

Counter-Defendant.

_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

**(March 15, 2004)**

Before EDMONDSON, Chief Judge, BIRCH and FARRIS[*], Circuit Judges.

FARRIS, Circuit Judge:

Club Car of Quebec (CCQ) and its president, Martin Murphy, appeal the judgment against them on several claims arising out of Club Car Inc.'s termination of CCQ as its distributor of golf carts. We affirm.

## Background

Under a series of written distribution agreements, CCQ, a Quebec corporation, served as the Quebec distributor of golf carts manufactured by Club Car, a Georgia corporation, from 1980 through 2000. In 1990 and 1991, CCQ president Martin Murphy executed a personal guaranty to ensure payment of CCQ's debts.

During the 1990's Club Car and CCQ agreed that Club Car could sell used carts in Quebec, but that CCQ would have a right of first refusal on those

_____

[*] Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

2

products. If CCQ declined to purchase them, it would receive a commission on each cart Club Car sold to another buyer. Disagreements later arose when Club Car began selling used carts containing new parts to a competitor, Equipements Pierre Champigny (EPC). This arrangement ended in 1997, but Club Car continued selling used carts.

In 1999, Club Car began charging CCQ a Quebec Provincial Sales Tax (QST) for its products with the stated intent of remitting the taxes to the Quebec Government. For various reasons, Club Car delayed paying the taxes until June of 2001. CCQ claims it suffered tax penalties as a result of this delay.

In 2000, Club Car terminated its contract with CCQ and awarded the distributorship to EPC, whose president is Pierre Champigny. Later, Club Car filed suit to recover more than $1.5 million in payments due from CCQ and from Murphy under the personal guaranty. CCQ and Murphy filed three lengthy counter claims against Club Car asserting, among other claims, breach of contract, conspiracy to breach a contract, and conversion arising out of the distribution agreement, as well as breach of fiduciary duty, violations of federal and state RICO laws, and fraud arising out of Club Car's mishandling of the QST taxes. CCQ later joined EPC and Champigny as counterclaim defendants, alleging

tortious interference with a business relationship and contract, and conspiracy to breach a contract.

On January 17, 2003, the trial court granted Club Car's motion for partial summary judgment, dismissing CCQ's RICO and fraud claims, and its breach of contract claim connected with the alleged used cart agreement. On January 31, EPC and Champigny moved to apply Quebec law to CCQ's claims against them. On February 3, CCQ moved to amend the pretrial order, agreeing to limit its claims against Club Car to breach of contract, conspiracy to breach a contract, breach of fiduciary duty, and promissory estoppel, and to limit its claims against Champigny and EPC to conspiracy to breach a contract and tortious interference with a business relationship and contract. On February 4, the trial court accepted CCQ's limitation of claims and granted EPC and Champigny's request to apply Quebec law.

After a five-day trial, a jury awarded Club Car $1,557,360 (Canadian) on its claims against CCQ and Murphy. The jury awarded CCQ $100,000 (Canadian) on its counterclaims against Club Car, but nothing on its claims against EPC and Champigny. The jury did not award attorney fees to either Club Car or CCQ. After trial, the trial court granted Club Car's motion for judgment as a matter of law and awarded Club Car attorney fees under the distribution contract.

4

## DISCUSSION

1. Damages Testimony.[1]

CCQ challenges rulings excluding testimony on the alleged damages connected with its various counter claims. It first contends that the trial court abused its discretion in striking the expert testimony of its accountant, Peter Ryan, on lost profits under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). We review such rulings for abuse of discretion, *Judd v. Rodman*, 105 F.3d 1339, 1341 (11th Cir. 1997), and will reverse only if an erroneous ruling created a "substantial prejudicial effect." *Piamba Cortes v. American Airlines, Inc.*, 177 F.3d 1272, 1305 (11th Cir. 1999) (citations omitted).

Expert testimony is admissible if (1) the expert is qualified to testify on the topic at issue, (2) the methodology used by the expert is sufficiently reliable, and (3) the testimony will assist the trier of fact. ER 703; *Quiet Tech. DC-8 v. Hurel-Dubois UK, Ltd.*, 326 F.3d 1333, 1340-41 (11th Cir. 2003). To ensure that a proper foundation is made, the trial court must screen expert testimony to determine if it is relevant and reliable. *Daubert*, 509 U.S. at 589. Expert

---

[1]Martin Murphy joins in all of CCQ's claims that would result in an offset of the jury's award to Club Car under his personal guaranty.

testimony must be excluded if the reasoning or methodology underlying the opinion is scientifically invalid, or if the methodology cannot properly be applied to the facts. *Id*. at 592.

Ryan testified that CCQ's damages in the form of lost profits exceeded $10 million. But, as the trial court found, that estimate was based on gross sales and gross profit figures. Ryan admitted he had not factored in expenses CCQ would normally incur in generating income and sales. To recover lost profit damages in Georgia, "one must show the probable gain with great specificity as well as expenses incurred in realizing such profits. In short, the gross amount minus expenses equals the amount of recovery." *Shaw v. Ruiz*, 207 Ga. App. 299, 428 S.E.2d 98, 103 (1993) (citations omitted). Ryan failed to follow this rule. The trial court reasonably concluded his lost profit calculation was based on flawed methodology that was unaccepted in the accounting community. *See Daubert*, 509 U.S. at 593-94 (degree to which experts in the field accept technique relevant to admissibility). The court did not abuse its discretion in striking the testimony.

CCQ argues the *Daubert* objection was untimely because it was not raised until trial. A *Daubert* objection not raised before trial may be rejected as untimely. *Quiet Tech.*, 326 F.3d at 1350. But a trial court has broad discretion in determining how to perform its gatekeeper function, and nothing prohibits it from

6

hearing a *Daubert* motion during trial. *See Goebel v. Denver and Rio Grande Western R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000)(trial court may hold *Daubert* hearing "when asked to rule on a motion in limine, on an objection during trial, or on a post-trial motion. . . ."); *see also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) ("the trial judge must have considerable leeway" in determining whether expert testimony is reliable). The trial court permitted extensive voir dire and cross examination, then heard lengthy argument on Ryan's methods. The court adequately developed the record necessary to exercise sound discretion, and did not err in holding the *Daubert* hearing during trial. CCQ argues the trial court's ruling was based on improper evidence, pointing to the attempt by EPC's counsel to submit an excerpt from a handbook on damages. CCQ claims this tainted the court's ruling because the excerpt was not properly served on the parties. This contention is without merit. The excerpt was not "evidence" but legal authority in support of EPC's argument. Moreover, the trial court indicated it had not even seen the excerpt when it made its ruling.

CCQ next complains that the trial court confused the jury in striking Ryan's lost-profit testimony as follows:

> Members of the jury, with respect to Mr. Ryan's testimony as to damages, when he says that he did not take into consideration the expenses involved and merely used the gross amount, his opinion as to the loss on the Defendant's counterclaim is stricken. You are not to consider that.

CCQ claims the instruction failed to distinguish between lost profit and other damages, thereby misleading the jury into disregarding all of Ryan's testimony. Since CCQ failed to object to the instruction, reversal is required only if it can show plain error. Fed. R. Civ. P. 51; *Ford ex rel. Estate of Ford v. Garcia*, 289 F.3d 1283, 1287-88 (11th Cir. 2002). Although not a model of clarity, the instruction did refer to Ryan's conclusions that failed to account for CCQ's expenses. The instruction was not so misleading as to clearly prejudice CCQ. *Ford*, 289 F.3d at 1288.

Finally, the trial court did not commit reversible error in sustaining Club Car's objection to Ryan's testimony on losses CCQ allegedly suffered from Club Car's handling of QST taxes. CCQ vice president Anita Murphy had already testified that CCQ incurred more than $200,000 in fines and expenses due to Club Car's failure to remit QST to the Quebec Government. Ryan's testimony was cumulative and its exclusion was harmless. *Piamba Cortes*, 177 F.3d at 1305.

2. Jury Instructions.

CCQ claims the trial court abused its discretion in the "process and substance" of instructing the jury, focusing mainly on the relationship between Quebec law and its claims. It first argues that the trial court's "untimely" decision to apply Quebec law to its claims against EPC and Chamigny "spawned confusion" and prejudice. This argument is without merit. To avoid unfair surprise, a party must give reasonable notice, through its pleadings or otherwise, of its intent to rely on foreign law. Fed R. Civ. P. 44.1; *DP Aviation v. Smiths Industries Aero. & Def. Sys.*, 268 F.3d 829, 846 (9th Cir. 2001). EPC gave CCQ such notice at least twice, starting two weeks before trial. Moreover, in granting EPC's request, the court did not "change" the law; it simply applied well-established choice-of-law principles to claims that CCQ, a Quebec party, had against other Quebec parties. CCQ received reasonable notice. *DP Aviation*, 268 F.3d at 846.

Nor did the trial court err in denying CCQ's request to amend the pretrial order a second time so that it could reassert claims for defamation and bad faith business negotiations under Quebec law. "[F]or pretrial procedures to continue as viable mechanisms of court efficiency, appellate courts must exercise minimal interference with trial court discretion in matters such as the modification of its [pretrial] orders." *Jacobs v. Agency Rent-A-Car, Inc.*, 145 F.3d 1430, 1432 (11th

9

Cir. 1998) (quoting *Hodges v. United States*, 597 F.2d 1014, 1018 (5th Cir. 1979)). CCQ had agreed to drop those claims before trial in order to streamline its lengthy list of counter claims. The court did not abuse its discretion in refusing to amend the pretrial order again after trial had begun.

We also find no reversible error in the trial court's refusal to give CCQ's proposed Quebec law instructions on its breach of fiduciary duty and conspiracy claims against Club Car. For the most part, the instructions CCQ proposed merely added the following statements to the Georgia version of the law:

> Every person has a duty to abide by the rules of conduct which lie upon him, according to the circumstances, usage or law, so as not to cause injury to another.
> Where he is endowed with reason and fails in his duty, he is responsible for any injury he causes to another person by such fault and is liable to reparation for the injury, whether it be bodily, moral, or material in nature.

This added little to the instructions given, which already stated that Club Car had a legal duty to refrain from conspiring to breach its contracts, and a duty to fulfill its fiduciary obligations by using reasonable care in handling QST funds collected from CCQ. Assuming Quebec law applied to the claims, any error in refusing to give CCQ's proposed instructions is harmless since they would not have altered the thrust of what the jury was told. *See Carter v. DecisionOne Corp.*, 122 F.3d 997, 1005 (11th Cir. 1997) (instructional error does not require reversal unless we

10

are "left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations.") (quoting *Johnson v. Bryant*, 671 F.2d 1276, 1280 (11th Cir. 1982)).

CCQ also claims, with little analysis or citation to relevant authority, that the trial court gave various flawed Quebec law instructions. But CCQ fails to show how, considered as a whole, the instructions misstated the law or misled the jury. *Wilkinson v. Carnival Cruise Lines, Inc.*, 920 F.2d 1560, 1569 (11th Cir. 1991).[2]

Nor did the trial court violate Fed R. Civ. P. 51 by failing to hold a proper charge conference or allow CCQ sufficient time to review and object to proposed instructions. Before closing arguments, the trial court held a hearing at which all parties argued the instructions. Although the court abbreviated the hearing, it gave the parties an additional opportunity to object and propose new instructions after the jury was charged. The proceedings were consistent with Fed. R. Civ. P. 51.

---

[2]CCQ also claims the court erroneously instructed the jury that "all tortious conduct by Club Car and Champigny. . . had to occur in the state of Georgia" for the jury to award damages. The court gave no such instruction. It did instruct the jury that punitive damages could only be based upon conduct occurring in Georgia.

3. QST Claims

CCQ argues that the trial court erred in dismissing on summary judgment its state RICO and fraud claims connected with Club Car's handling of the QST it collected. We review summary judgment rulings de novo, viewing all facts and reasonable inferences in the light most favorable to the nonmoving party. *Tullius v. Albright*, 240 F.3d 1317, 1319 (11th Cir. 2001). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." *Clemons v. Dougherty County*, 684 F.2d 1365, 1369 (11th Cir. 1982).

To establish a pattern of racketeering activity under Georgia's RICO statute, CCQ needed to prove two related predicate acts that violated state or federal law. Ga. Cod. Ann. § 16-14-3(8), (9); *Roth v. Connor*, 235 Ga. App. 866, 510 S.E.2d 550, 557 (1998).[3] CCQ alleged that Club Car committed mail fraud, which

---

[3]Under Ga. Code Ann. § 16-14-4(a), Georgia's RICO statute:
[i]t is unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money.

requires proof of a specific intent to defraud or deceive. 18 U.S.C. § 1341; *United States v. Hasner*, 340 F.3d 1261, 1269 (11th Cir. 2003). CCQ's common law fraud claim has a similar scienter element. *Empire Distr. Inc. v. Hub Motors*, 240 Ga. App. 568, 524 S.E.2d 264, 265 (1999).

In support of summary judgment, Club Car presented evidence that it began collecting QST on the advice of its customs auditor in the Spring of 1999. Club Car's accountant explained the delay in remitting the tax by averring that: (1) shortly after Club Car began collecting QST, she was notified she could not remit the tax without a Quebec Provincial tax identification number; (2) she was not diligent in applying for the number because she was overworked and having personal problems; (3) the Quebec government rejected a defective application submitted in the Fall of 2000; (4) she resubmitted a corrected application in December 2000; and (5) an identification number was issued to Club Car in May 2001. All taxes were paid in June 2001, before CCQ filed its counterclaim alleging fraud.

In response, CCQ was required to come forward with "specific facts showing that there [was] a genuine issue for trial." Fed. R. Civ. P. 56(e). Instead, CCQ asserts only that the delayed payment raised an inference of fraudulent intent, and refers to what it claims are invoices containing false tax numbers

13

submitted by Club Car. But the delay was explained by Club Car's affidavits. Moreover, CCQ does not identify the invoices that allegedly contain false numbers. There were invoices containing a tax number associated with the financing entity for the transaction, which was listed as "buyer" on the invoices. CCQ fails to show how listing the tax number of a clearly-identified party evidences fraudulent intent. At best, this is nothing more than a scintilla of evidence and is insufficient to defeat summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

Contrary to CCQ's claim, the affidavit of Anita Murphy, which asserted that Club Car had falsified tax numbers and was unauthorized to collect QST, does not establish a question of fact as to intent. The trial court correctly disregarded this averment as barred by the hearsay rule because Murphy had attempted to relay what she claimed Quebec government officials had told her. Inadmissible hearsay generally cannot be considered on a motion for summary judgment. *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999).

CCQ also asserts that summary judgment was improperly granted because the trial court had erroneously denied CCQ's request to depose certain Club Car employees on the QST issue. CCQ fails to explain how the discovery rulings were erroneous or how the witnesses would have supported its claims. *See Flanigan's*

*Enterprises, Inc. v. Fulton County*, 242 F.3d 976, 987 n.16 (11th Cir. 2001) (party's failure to elaborate on or provide any citation of authority in support argument constitutes waiver) (citation omitted); *see also* Fed. R. App. P. 28(9)(A).[4]

CCQ next contends that the trial court erred in excluding the trial testimony of Lynda Cappadoccia of the Quebec government on the QST issue. The trial court made no such ruling. Instead, a magistrate denied CCQ's pretrial request to take Cappadoccia's videotaped deposition for trial, a ruling that CCQ failed to appeal to the district court. *See Farrow v. West*, 320 F.3d 1235, 1248-49 n.21 (11th Cir. 2003) (failure to appeal magistrate's nondispositive order to the district court precludes party from raising issue on appeal to the circuit court).

Finally, CCQ argues that the trial court abused its discretion in excluding as hearsay Anita Murphy's testimony that Quebec tax officials "had learned" that Club Car used false tax numbers and was unauthorized to collect QST. These were "out of court statements offered to prove the truth of the matter asserted." Fed. R. Evid. 801(c). The trial court properly excluded them. *See United States v. NationsBank of Fla. N.A.*, 53 F.3d 1548, 1554 (11th Cir. 1995) (trial court has broad discretion in determining admissibility of evidence).

---

[4]CCQ tests the limits of Fed. R. App. P. 28(9)(A) throughout its briefs.

15

4. Personal Jurisdiction: Murphy.

Martin Murphy argues that the district court lacked personal jurisdiction because he is a resident of Quebec without sufficient minimum contacts with Georgia. The Georgia long-arm statute provides for personal jurisdiction over a nonresident defendant who "[t]ransacts any business within this state." Ga. Code Ann. § 9-10-91(1). The statute confers jurisdiction to the "maximum extent permitted by due process." *SES Indus., Inc. v. Intertrade Pack. Mach. Co.*, 236 Ga. App. 418, 512 S.E.2d 316, 318 (1999). Due process requires that a defendant have sufficient minimum contact with the forum state to provide "fair warning that a particular activity may subject him to the jurisdiction of a foreign sovereign." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985) (citation omitted). In determining whether sufficient minimum contacts exist, we look to whether: (1) the defendant has acted so as to avail himself of the law of the forum state; (2) the claim is related to those acts; and (3) the exercise of jurisdiction does not violate notions of fair play and substantial justice. *SES Indus.*, 512 S.E.2d at 318.

A nonresident individual cannot be subject to personal jurisdiction based solely upon acts in Georgia taken in his or her corporate capacity. *Southern Electronics Distrib. v. Anderson*, 232 Ga. App. 648, 502 S.E.2d 257, 260 (1998).

16

Murphy's contacts with Georgia went beyond his visits to the state as CCQ president. Murphy engaged in negotiations with Club Car for the underlying distribution agreements as well as the personal guaranty. As the trial court found, Murphy was more than a passive participant in CCQ's dealings in Georgia. As principal and primary shareholder of CCQ, Murphy enjoyed the substantial financial benefit from the distribution agreement, which he induced Club Car to enter by personally guaranteeing CCQ's debts. Notably, the distributorship agreement and the personal guaranty contract, in effect for many years, provided for their enforcement in the state of Georgia, under Georgia law. These circumstances establish that Murphy acted to avail himself of Georgia law, the claim is related to those acts, and it was fair for Georgia to assert jurisdiction over him. *See White House v. Winkler*, 202 Ga. App. 603, 415 S. E. 2d 185 (1992). The trial court correctly found that Murphy had sufficient minimum contacts with Georgia.

5. Attorney Fee Award-Validity of Personal Guaranty

Finally, CCQ and Murphy challenge rulings awarding attorney fees to Club Car and rejecting Murphy's claims that the personal guaranty contract was unenforceable. Both issues arose in rulings on motions for judgment as a matter of law entered after the initial judgment was entered and the initial notice of

17

appeal was filed. In light of this, CCQ and Murphy were required to amend their notice of appeal to designate the rulings and amended judgment affected by those rulings. Fed. R. App. P. 4(a)(4)(B)(ii). They amended their notice, but failed to designate the rulings and judgment they now challenge.

Fed. R. App. P. 3(c) requires a notice of appeal to "designate the judgment, order or part thereof appealed from." We have jurisdiction to review only those judgments or orders specified–expressly or impliedly–in the notice of appeal. *Pitney Bowes, Inc. v. Mestre*, 701 F.2d 1365, 1374-75 (11th Cir. 1983). Where a notice of appeal specifies a particular judgment or ruling, we infer that others are not part of the appeal. *Id.* The failure to designate the post-trial rulings on attorney fees and the personal guaranty precludes CCQ and Murphy from challenging them in this appeal.[5]

AFFIRMED.

---

[5]Murphy's challenge to personal jurisdiction is not similarly-barred because he raised the issue in at least two pretrial motions to dismiss. "The appeal from a final judgment draws in question all prior non-final orders and rulings which produced the judgment." *Barfield v. Brierton*, 883 F.2d 923, 930 (11th Cir. 1989).