**CLUB CAR, INC., Plaintiff,**

v.

**CLUB CAR (QUEBEC) IMPORT, INC., and Martin Murphy, Defendants.**

and

**Club Car (Quebec) Import, Inc., Counterclaim Plaintiff,**

v.

**Club Car, Inc., Pierre Champigny, Equipements Pierre Champigny, Ltd., and Ingersoll Rand Co., Counterclaim Defendants.**

No. CIV.A.100–195.

United States District Court, S.D. Georgia, Augusta Division.

Jan. 17, 2003.

James B. Ellington, Thomas L. Cathey, Hull, Towill, Norman, Barrett & Salley, PC, Thomas W. Tucker, Tucker, Everitt,

Long, Brewton & Lanier, PC, Augusta, for Club Car, Inc., plaintiff.

Sam G. Nicholson, Augusta, Andrew M. Scherffius, III, Darren W. Penn, Scherffius, Ballard, Still & Ayres, LLP, Stephen F. Humphreys, Stephen F. Humphreys, PC, Athens, Jeffrey R. Harris, Scherffius, Ballard, Still & Ayres, LLP, Savannah, for Club Car (Quebec) Import, Inc., Martin Murphy, defendants.

### *ORDER*

ALAIMO, District Judge.

Plaintiff has filed a civil action against Club Car Quebec Import, Inc. ("CCQ"), and Martin Murphy alleging a breach of a distributorship agreement and guaranty contract. CCQ and Murphy subsequently filed three lengthy counterclaim complaints against Plaintiff and added Pierre Champigny, Equipements Pierre Champigny, Ltd., and Ingersoll Rand Company to this action as Counterclaim Defendants. The counterclaims encompass charges, *inter alia,* of conversion, money had and received, breach of contract, racketeering, and fraud on the part of Plaintiff and Counterclaim Defendants. Now pending before the Court are a partial summary judgment motion filed by Plaintiff, a partial summary judgment motion filed by CCQ, a summary judgment motion filed by Murphy, a summary judgment motion filed by Champigny and Equipements Pierre Champigny, and a summary judgment motion filed by Ingersoll Rand Company. For the reasons that follow, the Court will **GRANT** summary judgment in favor of Ingersoll Rand Company, Champigny, and Equipements Pierre Champigny, and partial summary judgment in favor of Plaintiff. The Court will **DENY** the motion for summary judgment filed by Murphy and the motion for partial summary judgment filed by CCQ.

## BACKGROUND

Plaintiff designs and manufactures golf carts and their parts for sale or lease through authorized distributors and direct channels. Since the early 1980s, CCQ has been an authorized distributor of Plaintiff's golf carts and parts pursuant to a series of distributorship agreements. Murphy is the president and principal shareholder of CCQ.

Under the distributorship agreements, which continued until September 1, 2000, CCQ distributed Plaintiff's golf carts and parts in Quebec and elsewhere in Canada. The distributorship agreements provided that CCQ would order new golf carts and parts from Plaintiff in Augusta, Georgia, for delivery either to CCQ's principal place of business or directly to its customers. Plaintiff extended credit to CCQ in the course of their business relationship, and the parties regularly exchanged orders, payments, and commissions. In 1990, Plaintiff and Murphy executed a personal guaranty to ensure payment by either Murphy or CCQ on golf carts and parts ordered by CCQ and provided by Plaintiff on credit.

In the early 1990s, Plaintiff and CCQ reached an oral agreement under which CCQ would have a right of first refusal on all of Plaintiff's used golf carts sold within its territory. If CCQ declined to purchase the used carts under its right of first refusal, it would receive a $100 commission on each cart subsequently sold in its territory. A disagreement over the nature of the arrangement arose in 1996 and resurfaced again in June 1997, when Murphy wrote to Ray Bentley[1] to complain about the sale of used golf carts to Pierre Champigny. After consulting with his supervisors, Bentley elected to end the used cart arrangement between Plaintiff and CCQ. Murphy was notified by letter that the arrangement would end on December 31, 1997.[2] Despite the urging of Murphy at a sales seminar in August 1997, Bentley declined to reconsider the decision to terminate the arrangement.

In addition to the distributorship agreements concerning golf carts, Plaintiff and CCQ also engaged in a series of written agreements concerning the distribution of utility vehicles, or "carryall" vehicles.[3] The last distributorship agreement concerning carryall vehicles expired on February 28, 1989.

In 1998, an interest arose in renewing the utility vehicle distributorship agreement. Plaintiff contends that interest in a new agreement originated on the part of CCQ and Murphy, while CCQ contends that Plaintiff contacted it to express interest in renewing the agreement. In any case, Dave Marmelstein, then a regional manager for Plaintiff, met with Murphy in the summer of 1998 to discuss the possibility of CCQ becoming a utility vehicle dealer. CCQ contends that an oral agreement concerning a utility distributorship was reached at that meeting, while Plaintiff's position is that the meeting was only informational in nature and resulted in Marmelstein directing Murphy to formulate a

---

1. Bentley held the position of national sales manager with Plaintiff from 1996 through 1998. Prior to 1996, he served within the company as credit manager and he now serves as director of "eastern direct zone sales."

2. CCQ contends that, while the right to receive commissions was terminated in the letter, the used cart agreement was not terminated insofar as CCQ retained a right of first refusal on all used golf carts sold in its territory. Plaintiff contends that the letter ended the arrangement in its totality.

3. The carryall vehicle is distinct from the golf cart in that it is designed for industrial, rather than personal, use. CCQ contracted to sell Plaintiff's turf utility vehicles.

business plan concerning the proposed dealership. Marmelstein never received the business plan. CCQ did receive utility vehicles from Plaintiff for sale between 1998 and 2000, but Plaintiff contends that no distributorship agreement was in place.

Since early 1999, Plaintiff has been charging CCQ a Quebec Provincial Sales Tax ("QST") for products shipped by Plaintiff into the Canadian province of Quebec. Joan Speering, an accountant employed by Plaintiff, was responsible for handling Canadian tax matters and maintaining the general ledger where CCQ's QST payments were recorded. Speering contacted the province of Quebec concerning the submission of QST payments and was told that she would need a QST identification number before she could remit QST funds. Speering, however, did not send an application for a QST identification number until August or September, 2000.[4] When she did send in an application, she did so incorrectly. The necessary corrections were made to the application and it was submitted on December 12, 2000.

Plaintiff received its identification number five months later, on May 11, 2001. Speering then issued a check for the tax due, and the province of Quebec negotiated the check on July 9, 2001.

Plaintiff filed the instant action in the superior court of Columbia County, Georgia, on August 29, 2000, seeking to recover more than $1.5 million for goods delivered to CCQ for which Plaintiff was never paid. Defendants removed the case to this Court and filed a motion for dismissal, which the Court denied. Defendants then filed three lengthy counterclaims against Plaintiff and three new Counterclaim Defendants alleging breach of contract, wrongful termination of contract, tortious interference with business relations, tortious interference with the prospective sale of business, conspiracy, conversion, breach of fiduciary duty, violations of federal and state RICO laws, and fraud.

## DISCUSSION

### I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Thus, summary judgment is granted against a party who fails to produce evidence sufficient to prove each element of a claim on which it will bear the burden at trial. *Id.*

Summary judgment is granted if the court finds that there is no genuine dispute as to a material fact. This materiality requirement mandates that only disputes over facts that might affect the outcome of the lawsuit are considered. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute is "genuine" if there is evidence sufficient for a reasonable jury to return a verdict for the nonmoving party. *Id.* All evidence presented to the Court relevant to a motion for summary judgment must be viewed in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Sweat v. Miller Brewing Co.*, 708 F.2d 655, 656 (11th Cir.1983). However, "[i]f the evidence is merely colorable, or is not signifi-

---

4. Plaintiff contends that the delay in submitting the application was the result of added responsibility placed on Speering, the resig-

nation of her supervisor, and "a personal matter that Speering was experiencing at the time." Pl. MSJ Brief at 9.

cantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511 (internal citations omitted). The court must draw all reasonable inferences in favor of the nonmoving party. *Carlin Communication Inc., v. Southern Bell Telephone & Telegraph Company,* 802 F.2d 1352, 1356 (11th Cir. 1986). At the summary judgment stage, the court may not weigh the evidence or make credibility determinations. *Chapman v. American Cyanamid Co.,* 861 F.2d 1515 (11th Cir.1988).

Once the moving party has met its burden under Rule 56(c) and (e), the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Electrical Industrial Co., v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). This means, simply, that the nonmoving party may not rest on the pleadings but must present specific facts showing an issue for trial. *Id.* The Court will address the merits of each summary judgment motion in turn.

## II. PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff seeks partial summary judgment on Defendants' claims under federal and state Racketeer Influenced and Corrupt Organizations ("RICO") statutes and common law fraud, as raised in Defendant's counterclaim complaint of April 2, 2002. Under 18 U.S.C. § 1964(c), the federal RICO statute, "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court . . . ." Section 1962 provides that

(a) It shall be unlawful for any person who has received any income, derived directly or indirectly from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. . . .

(b) It shall be unlawful for any person through a pattern of racketeering activity or collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of an unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

A federal RICO defendant must have engaged in a "pattern of racketeering activity," which involves "at least two acts of racketeering activity." 18 U.S.C. § 1961(5). "Racketeering activity" may encompass a number of predicate acts. *Id.* § 1961(1). In this case, Defendants allege that Plaintiff participated in mail fraud under 18 U.S.C. § 1341 and extortion under the Hobbs Act, 18 U.S.C. § 1951.

Georgia's RICO statute, O.C.G.A. § 16–4–1 et seq., is "essentially identical to the federal RICO provisions." *Pelletier v. Zweifel,* 921 F.2d 1465, 1491 n. 57 (11th Cir.1991). Consequently, federal courts have applied the same analysis to state

RICO claims as to federal claims. *E.g., Georgia v. Dairymen, Inc.,* 813 F.Supp. 1580, 1585 (S.D.Ga.1991); *Morast v. Lance,* 631 F.Supp. 474, 481 (N.D.Ga. 1986).

As grounds for summary judgment, Plaintiff challenges whether Defendants have pleaded sufficiently their RICO counterclaims and whether Defendants are able to prove the predicate acts underlying the RICO charges. The Court will address each contention in turn.

### A. *Sufficiency of Pleading RICO Claims*

■ Plaintiff first contends that Defendants have pleaded insufficiently their RICO charges. Because of the specificity of the RICO statute and the stigma associated with charges of racketeering, courts have held RICO claims to enhanced specificity of pleading requirements. "In face of the difficulties courts have had in interpreting the provisions of RICO, and also in face of the treble damage liability which defendants are subject to, it is imperative that the court and the defendant be placed on clear notice as to what is being alleged, and what the substance of the claim is, in order to facilitate a decision on the merits of the case." *Ralston v. Capper,* 569 F.Supp. 1575, 1581 (E.D.Mich.1983); *accord Doxie v. Ford Motor Credit Co.,* 603 F.Supp. 624, 628 (S.D.Ga.1984). In order to facilitate the enhanced pleading requirement, Local Rule 9.1 requires a complainant to complete a RICO statement to accompany the RICO charges in its complaint. Defendants in this case completed their RICO statement. Plaintiff, however, contends that both the counterclaim complaint and the RICO statement are deficient in their specificity.

Specifically, Plaintiff contends that Defendants have failed to specify sufficiently the nature of the alleged "enterprise" involved in the RICO claims. Under 18 U.S.C. § 1962(a)-(d), a RICO defendant must be involved in an enterprise, which is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *Id.* § 1961(5). Local Rule 9.1 requires a plaintiff to "describe the structure, purpose, function, and course of conduct of the alleged enterprise." S.D. Ga. L.R. 9.1 app.

In their RICO statement, Defendants describe the alleged enterprise as follows:

The alleged enterprise for Club Car's 1962(a) violations, with respect to mail fraud, is either Club Car or Ingersoll Rand, or the two in association. The enterprise for Club Car's 1962(a) violations, with respect to the Hobbs Act, is either Club Car or Ingersoll Rand, or the two in association, with the added alternative enterprises of Champigny or Champigny in association with Club Car. The enterprise for Club Car's 1962(b) violation is Club Car. The enterprise for Club Car employee's 1962(c) violation is Ingersoll Rand or Ingersoll Rand in association with Club Car and, alternately, Champigny or Champigny in association with Club Car.

The enterprise for Club Car and Champigny's 1962(d) violation corresponds to the enterprise of Club Car's 1962(a, b & c) violations.

The enterprise for Ingersoll Rand's 1962(a) violation is Ingersoll Rand or Club Car, or the two in association.

The enterprise for Champigny's 1962(a) violation is Champigny or Champigny in association with Club Car.

Doc. 108 at 11, 12.

The Court can understand the difficulty experienced by Plaintiff and Counterclaim Defendants in deciphering the maze of conjunctions and equivocal descriptions attached to the alleged enterprise. Defen-

dants, for their part, concede the ambiguous nature of their enterprise designation:

> The counterclaim co-defendants are correct that there are a multiplicity of options in configuring these enterprises and associations which arise from the complexity of the statute. They have raised these as pleading issues. CCQ certainly anticipates streamlining its case, for clarity to the Court and to the jury, in the trial of this case, possibly eliminating some federal RICO claims altogether. That, however, is a proper subject for the pre-trial order, not a summary judgment motion.

Def. MSJ Resp. Brief at 12. Apparently, Defendants also do not intend to afford the Plaintiff and Counterclaim Defendants the same clarity in enumerating their claims, which, of course, will force upon those parties the effort and expense of preparing for every conceivable attack at trial. Such is the essence of "shotgun pleading," and the enhanced pleading requirements of RICO are aimed at preventing such unfair practice.

Defendants seem unsure as to which entities composed the alleged enterprise in this case despite their extensive discovery efforts. No factual allegations are presented from which the Court could infer that Plaintiff and Counterclaim Defendants formed a common enterprise, the nature of that enterprise, or how long that enterprise continued. Defendants have shown that Plaintiff is a subsidiary of Counterclaim Defendant, Ingersoll-Rand, and alleged that Counterclaim Defendant, Equipements Pierre Champigny, purchased equipment from Plaintiff in the course of Plaintiff's distributorship relationship with CCQ. Defendants have failed to plead allegations or present facts sufficient to support an inference that Plaintiff and either Counterclaim Defendant participated in a common enterprise engaged in illicit activity. The deficiency in Defendants' pleading is most glaring

with respect to 18 U.S.C. § 1962(c), which requires that the RICO defendant be separate and distinct from the alleged enterprise, *United States v. Goldin Ind.*, 219 F.3d 1268, 1270 (11th Cir.2000), and each defendant "must participate in the operation or management of the enterprise itself," and thus not be an "outsider," in order to be considered an enterprise participant. *Reves v. Ernst & Young*, 507 U.S. 170, 185, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993).

Defendants have failed to present factual allegations detailing the structure or nature of the alleged enterprise, or even the participants in the enterprise. Congress's purpose in enacting RICO laws was to combat the "infiltration of organized crime and racketeering into legitimate organizations." S.Rep. No. 91–617 at 76. Such an end is not served where RICO is used as a vehicle for "shotgun pleading," where disheveled, undetailed pleadings leave opposing parties guessing about precisely what awaits them at trial or in a dispositive motion. If Plaintiff and Counterclaim Defendants indeed organized themselves with the intent of promulgating a pattern of fraudulent and illicit behavior, Defendants, after their extensive discovery efforts, should be able to present factual allegations enumerating the participants and detailing the structure of the enterprise. Instead, Defendants have merely alleged, under their RICO claims, that Plaintiff and Counterclaim Defendants conducted their relationship in a manner that defrauded Defendants.

Plaintiff also asserts that Defendants have failed to plead sufficiently their state law RICO claims. Defendants allege in conclusory fashion that Plaintiff's "employees conducted and participated in an enterprise through a pattern of racketeering activity" in violation of O.C.G.A. § 16–4–1 et seq. Def. Counterclaim Complaint

¶ 175. Defendants fail to state specifically the predicate acts on which their state law RICO claims are based, beyond asserting that "[t]he predicate acts for federal RICO purposes also constitute predicate acts under the Georgia statute ...." *Id.* ¶ 170.

■ While Defendants' counsel would be well-advised in the future to abide by the strictures of Local Rule 9.1, which require a complainant to "specifically state" the grounds for each violation, given the similarity between federal and state RICO statutes, the Court will not strike Defendants' state RICO allegations because they were insufficiently pleaded. Plaintiff and Counterclaim Defendants can reasonably deduce from the counterclaim complaint and RICO statement that Defendants intend to raise the same predicate acts under state RICO laws as they have under federal RICO laws.[5] Additionally, the failure to present factual allegations pertaining to the alleged enterprise does not defeat Plaintiff's state RICO claims, as violation of state RICO law "does not require that there be proof of an 'enterprise,' but only that the accused through a pattern of racketeering activity or proceeds derived therefrom ... acquire or maintain, directly or indirectly, any ... real or personal property of any nature, including money." *Dover v. State*, 192 Ga. App. 429, 431, 385 S.E.2d 417 (1989).

Thus, Defendants' state RICO claims will not be dismissed because of deficiencies in the manner in which they were pleaded. Because Defendants' federal RICO claims fall short of identifying the relevant "enterprise" engaged in RICO-prohibited behavior, however, those claims are properly dismissed.

### B. *Predicate Acts*

Plaintiff also contends that Defendants cannot establish Plaintiff's liability under either of the federal statutes presented as predicate acts in the RICO statutory scheme. "Section 1961 requires that a RICO plaintiff establish that a defendant could be convicted for violating any of its predicate statutes." *Panama v. BCCI Holdings*, 119 F.3d 935, 948 (11th Cir. 1997). Of the predicate statutes listed in § 1961, Defendants assert that Plaintiff has committed extortion in violation of the Hobbs Act, 18 U.S.C. § 1951, and mail fraud under 18 U.S.C. § 1341. The Court will address each statute in turn.

#### 1. The Hobbs Act

■ The Hobbs Act, 18 U.S.C. § 1951, prohibits the commission of extortion, defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). Defendants contend that Plaintiff extorted CCQ's property rights in its used cart agreement and in the alleged utility vehicle dealership agreement.

With regard to the used cart agreement, Defendants contend that Plaintiff exploited "its economic power over CCQ, through the fear that the distributorship could be canceled." Def. Counterclaim Complaint ¶ 155. Plaintiff seeks summary judgment on the ground that extortion requires something more than the fear of economic loss associated with failure to perform under a contract, that the evidence contradicts Defendants' assertion that CCQ possessed a legitimate fear of dealership termination, and because De-

---

5. The list of predicate acts specified under state law as "racketeering activity" incorporates the list of acts included under the feder-al RICO statute at 18 U.S.C. § 1961. O.C.G.A. § 16–14–3(9)(A)(xxix).

fendants did not give consent to the termination of the contract.

The Eleventh Circuit has recognized that the fear of economic loss must be "separate and distinct" from fear associated with the prospect of the other party not performing under the contract. *Robert Suris Gen. Contractor Corp. v. New Metropolitan Federal Savings and Loan Assoc.*, 873 F.2d 1401, 1405 (11th Cir.1989). Extortion occurs when a party to a contract fraudulently puts the other party in a position of financial risk in order to gain a concession at the time of performance of the contract. *E.g., Battlefield Builders v. Swango*, 743 F.2d 1060, 1063 (4th Cir. 1984). Thus, the "implicit threat," Doc. 108 at 9, of Plaintiff terminating CCQ's distributorship does not constitute the sort of extra-contractual influence that would establish a legitimate extortion claim.

Defendants also have failed to present evidence, in the form of supporting affidavits or otherwise, of their fear of Plaintiff terminating the distributorship. Letters sent from Murphy to Plaintiff indicate no expression of fear or concern regarding the future of CCQ's distributorship agreement and the deposition of Murphy taken in the case yields little evidence of such fear. In fact, Anita Murphy, Defendant Murphy's wife, testified that "the distributor's agreement . . . was never in question" even after the used cart arrangement ended. Anita Murphy Dep. at 48. CCQ has not presented sufficient evidence of fear of economic loss required to sustain an action under the Hobbs Act.

The Hobbs Act forbids "the obtaining of property from another, *with his consent*, induced by wrongful use of actual or threatened force, violence, or fear . . . ." 18 U.S.C. § 1951(b)(2) (emphasis added). In this case, CCQ asserts in its RICO statement that Plaintiff "unilaterally deprived" it of the used cart arrangement. Thus, CCQ has not alleged that Plaintiff obtained property with CCQ's consent, a requisite element of a Hobbs Act violation. *See Elliott v. Foufas*, 867 F.2d 877 (5th Cir. 1989) (upholding dismissal because plaintiff concedes in her complaint that "no one 'took' her commissions with her consent"); *United States v. Howe*, 353 F.Supp. 419, 422 (W.D.Mo.1973) (enumerating elements of Hobbs Act violation). Thus, CCQ has not stated a valid claim under the Hobbs Act with regard to the used cart agreement because it has not cited a fear of economic loss separate and distinct from performance of the contract, it has not presented sufficient evidence of any fear of economic loss sufficient to support a Hobbs Act claim, and it failed to plead that the termination of the used cart agreement was obtained with its consent.

█ With regard to the utility vehicle agreement, CCQ's extortion claim likewise falls short for failure to present evidence of any fear of economic loss or to claim that the utility vehicle agreement was terminated with its consent. CCQ's claim also is defeated under the statute of frauds. No written agreement existed between CCQ and Plaintiff concerning the sale of utility vehicles. CCQ contends that an oral agreement was reached "in or about 1998," while Plaintiff argues that no such oral agreement occurred and CCQ, thus, had no property interest in a utility vehicle agreement. Without a property interest in the utility vehicle agreement, CCQ would be unable to claim a deprivation of a property right through extortion.

Assuming, *arguendo*, that an oral agreement was reached "in or about 1998," the agreement would be subject to the application of Georgia's statute of frauds. Under O.C.G.A. § 13–5–30, an oral contract that will not be performed in one year is not enforceable. *See Yarborough v. Hi–Flier Mfg. Co.*, 63 Ga.App. 725, 728, 12 S.E.2d 133, 135 (1940) (holding that oral distribu-

torship contract intended to run from year to year was not enforceable under statute of frauds). Thus, at the time CCQ claims extortion occurred, in 2000, any oral contract formed between it and Plaintiff in 1998 would no longer be enforceable under law. CCQ has failed to assert that it lost any property interest in Plaintiff's alleged acts of extortion related to the purported utility vehicle agreement, and the extortion claim fails on this ground.

### 2. Mail Fraud

■ CCQ also asserts that Plaintiff violated the federal mail fraud statute, 18 U.S.C. § 1341, as a predicate act to its RICO claims. Mail fraud "occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails ... in furtherance of that scheme." *Cesnik, v. Edgewood Baptist Church*, 88 F.3d 902, 906 n. 8 (11th Cir.1996) (quoting *Pelletier v. Zweifel*, 921 F.2d 1465, 1498 (11th Cir. 1991)). CCQ must allege that Plaintiff acted with a "conscious and knowing intent to defraud" in order to state a valid claim under § 1341. *Pelletier*, 921 F.2d at 1499.

CCQ points to the delay in QST fund payments made by Plaintiff, and the allegedly false information presented by Plaintiff in the course of those payments, in its effort to show an intention to defraud CCQ. Specifically, CCQ contends that Plaintiff collected $124,000 in QST payments from CCQ, which are required under Canadian law, and did not remit the funds to the province of Quebec until June 6, 2001, approximately two years after Plaintiff began collecting the funds from CCQ. According to CCQ, Plaintiff's fraudulent intent also was shown as it initially remitted QST funds with invalid identification numbers. Plaintiff answers that the delay in remitting QST funds was the result of human error on the part of Joan Speering, Plaintiff's staff accountant, and

was not the result of any malevolent intent to defraud CCQ.

The Court finds that Plaintiff has not acted in a manner consistent with an intent to defraud and that CCQ has not presented evidence sufficient to support the inference of a fraudulent intent. While Speering displayed little diligence or sense of urgency in remitting the QST funds, the Court sees nothing in her actions, or in the actions of any of Plaintiff's employees, that would indicate any intent to defraud CCQ.

The Court also sustains Plaintiff's objection to portions of Anita Murphy's affidavit pertaining to information she gleaned from Quebec tax officials. The findings of Quebec officials constitute hearsay, and inadmissible hearsay is not properly considered in a motion for summary judgment. *E.g., Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir.1999).

At most, CCQ has presented evidence indicating that Plaintiff collected QST funds from CCQ, Plaintiff delayed in obtaining its QST identification number and in remitting the QST funds, and that Plaintiff committed errors in its first attempt to remit the funds. None of these assertions supports an inference of fraudulent intent. The most compelling evidence supporting the notion that Plaintiff did not act with an intent to defraud CCQ is that Plaintiff did submit, albeit in a belated fashion, the QST funds. Thus, if Plaintiff had intended to fraudulently deprive CCQ of QST funds, it certainly did not benefit from the attempt.

### C. Elements of RICO Law

As the Court has noted, Defendants' federal RICO claims fail because they were insufficiently pleaded and because the asserted predicate acts underlying the RICO claims are themselves deficient. Defendants' RICO claims also fail because

they are unable to satisfy the individual elements of their RICO claims.

### 1. 18 U.S.C. § 1962(a)

■ Under 18 U.S.C. § 1962(a), it is unlawful to invest income in an enterprise where the income is derived from a pattern of racketeering activity. "Section 1962(a) has two components: (1) receiving income from a pattern of racketeering activity, and (2) investing that income in an enterprise." *Georgia v. Dairymen, Inc.,* 813 F.Supp. 1580, 1584 (S.D.Ga.1991). "[T]he plain language of Federal RICO shows that injury by reason of investment of racketeering income-investment injury-is required." *Id.* at 1583. The investment injury must "flow from the defendant's *use* or *investment* of racketeering income." *Danielsen v. Burnside–Ott Aviation Training Center, Inc.,* 941 F.2d 1220, 1229 (D.C.Cir.1991) (emphasis in original). Thus, CCQ must demonstrate an injury caused by the use or investment of income derived from racketeering activity, not just that it was injured by the underlying predicate acts. *Fogie v. THORN Americas, Inc.,* 190 F.3d 889, 895 (8th Cir.1999); *Compagnie De Reassurance D'Ile De France, v. New England Reinsurance Corp.,* 57 F.3d 56, 91 (1st Cir.1995); *Parker & Parsley Petroleum Co. v. Dresser Ind.,* 972 F.2d 580, 582 (5th Cir.1992); *Nugget Hydroelectric L.P. v. Pacific Gas and Electric Co.,* 981 F.2d 429, 437 (9th Cir.1992); *Kehr Packages v. Fidelcor, Inc.,* 926 F.2d 1406, 1411 (3d Cir.1991); *Ouaknine v. MacFarlane,* 897 F.2d 75, 82–83 (2d Cir.1990); *Craighead v. E.F. Hutton & Co.,* 899 F.2d 485, 494 (6th Cir.1990); *Grider v. Texas Oil & Gas Corp.,* 868 F.2d 1147, 1149 (10th Cir.1989).

Defendants here have not alleged any injury resulting from the investment of racketeering income. Accordingly, their claim under § 1962(a) must fail.

### 2. 18 U.S.C. § 1962(b)

■ Under 18 U.S.C. § 1962(b), it is unlawful for a person to acquire or maintain, through a pattern of racketeering activity, an interest in an enterprise engaged in interstate commerce. Section 1962(b) requires that a RICO complainant prove that it has been injured "by acquiring or maintaining, through a pattern of racketeering activity, an interest in or control over such enterprises." *Pelletier,* 921 F.2d at 1518. Thus, just as § 1962(a) requires an investment injury, § 1962(b) requires an "acquisition injury." *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n,* 176 F.3d 315, 329 (6th Cir. 1999); *Discon, Inc. v. NYNEX Corp.,* 93 F.3d 1055, 1062–63 (2d Cir.1996), *rev'd on other grounds,* 525 U.S. 128, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998); *Compagnie De Reassurance D'Ile De France,* 57 F.3d at 91; *Kehr Packages,* 926 F.2d at 1411; *Old Time Enterprises, Inc. v. International Coffee Corp.,* 862 F.2d 1213, 1219 (5th Cir. 1989).

Defendants have failed to demonstrate any injury resulting from Plaintiff's acquisition of an enterprise. Accordingly, their claim under § 1962(b) fails.

### 3. 18 U.S.C. § 1962(c)

■ Section 1962(c) makes it unlawful for a person to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity. For purposes of § 1962(c), the "person" must be separate and distinct from the "enterprise" engaged in racketeering activity. *United States v. Goldin Ind.,* 219 F.3d 1268, 1270 (11th Cir.2000). As the Court held in Section II.A of this Order, Defendants have not pleaded sufficiently the existence of an enterprise separate and distinct from Plaintiff or either of the two Counterclaim Defendants. Accordingly, Defendants' claim under § 1962(c) cannot be sustained

for failure to establish the existence of a separate, distinct enterprise engaged in racketeering activity.

### 4. 18 U.S.C. § 1962(d)

Under 18 U.S.C. § 1962(d), it is unlawful to enter a conspiracy with the intention of violating § 1962(a), (b), or (c). Defendants allege that Plaintiff and a Counterclaim Defendant conspired to commit extortion. The Court, however, has held that Defendants' claims under § 1962(a), (b), and (c) fail as a matter of law. Where the predicate offenses underlying a conspiracy charge lack merit, the conspiracy charge itself fails. *BancOklahoma Mortgage Corp. v. Capital Title Co.*, 194 F.3d 1089, 1103 (10th Cir.1999); *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993); *Grider v. Texas Oil & Gas Corp.*, 868 F.2d 1147, 1149 (10th Cir.1989). Thus, Defendants cannot sustain a claim under § 1962(d).

### D. *Georgia RICO*

■ Georgia law pertaining to RICO is codified at O.C.G.A. § 16–14–1 et seq. Under § 16–4–4,

(a) It is unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money.
(b) It is unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity.
(c) It is unlawful for any person to conspire or endeavor to violate any of the provisions of subsection (a) or (b) of this Code section.

While it is unclear from their complaint and RICO statement which predicate acts Defendants intend to allege as part of Plaintiff's "pattern of racketeering activity," the Court will assume that the alleged predicate acts under § 16–4–4 are the same ones Defendants alleged in their federal RICO claims. Because the Court has held that the alleged predicate acts fall short of stating a RICO claim in the federal sphere, those predicate acts likewise fail as a matter of state RICO law. Accordingly, Defendants may not maintain a RICO action under state law.

### E. *Common Law Fraud*

■ Finally, Plaintiff seeks summary judgment on Defendants' counterclaim relating to common law fraud. In Georgia, a fraud claim must have the following elements:

(1) a representation made by the defendant, (2) with the knowledge that it was false, (3) and with the intention of deceiving the plaintiff; (4) a reasonable reliance upon the representation by the plaintiff; and (5) loss by the plaintiff as a proximate result of the misrepresentation.

*Empire Distributors, Inc. v. Hub Motors Co.*, 240 Ga.App. 568, 568, 524 S.E.2d 264, 265 (1999). As the Court held in Section II.B.2 of this Order, Defendants have not presented evidence, beyond bare assertions in their counterclaim, of Plaintiff's intent to defraud Defendants. Accordingly, Defendants' common-law claim of fraud fails as a matter of law.

### F. *Conclusion*

Defendants have essentially "taken a simple breach of contract or garden-variety fraud claim and attempted to bootstrap it into a 'federal case' by couching the allegations in [RICO] statutory language. This is not the purpose for which RICO was enacted." *Robert Suris Gen. Contractor Corp. v. New Metropolitan Federal Savings & Loan Ass'n*, 873 F.2d 1401, 1404 (11th Cir.1989). For the fore-

going reasons, the Court **GRANTS** Plaintiff's motion for partial summary judgment. Defendants' federal and state RICO claims and its common law fraud claim against Plaintiff are **DISMISSED.**

### III. COUNTERCLAIM DEFENDANT INGERSOLL–RAND'S MOTION FOR SUMMARY JUDGMENT

In their counterclaim, Defendants bring federal and state RICO charges against Ingersoll–Rand Company Limited ("IRCL").[6] IRCL has filed a motion for summary judgment on each of those counterclaim charges.

Defendants have alleged that IRCL has violated 18 U.S.C. § 1962(a), which prohibits the investment of proceeds derived from racketeering activity. As predicate acts, Defendants allege IRCL's participation in the same mail fraud and extortion claims that were the subject of the counterclaim against Plaintiff. Because Defendants' claims of mail fraud and extortion against Plaintiff were pleaded insufficiently and otherwise lacked merit as a matter of law, as set forth in Section II of this Order, Defendants' claims against IRCL fail for the same reasons. Likewise, Defendants' claims in state law against IRCL lack merit.

IRCL also may not be held liable under RICO laws because Defendants have not presented evidence linking IRCL with any alleged racketeering activity. IRCL was incorporated on August 10, 2001. The alleged predicate act of mail fraud would have transpired from April 1999 until September 2000. Angie Arnold Aff. ¶¶ 6, 8. The alleged acts of extortion occurred in July 1997 and March 2000. Def. Counterclaim Comp. ¶ 154. Thus,

Defendants' position that IRCL "indirectly derived income from Club Car's pattern of racketeering activity," RICO Statement at 3, is not sustainable because IRCL was not yet in existence. Even if IRCL had "indirectly derived" income from Plaintiff's racketeering behavior, "a liable person who receives and invests RICO-generated income must have participated as principal in the underlying racketeering activity." *Genty v. Resolution Trust Corp.*, 937 F.2d 899, 908 (3d Cir. 1991).

Consequently, Defendants have not alleged sufficient participation of IRCL in Plaintiff's alleged racketeering activity, nor have they presented evidence that IRCL could have received racketeering income from Plaintiff. For these reasons, and because Defendants' RICO claims against IRCL are pleaded insufficiently and otherwise fail as a matter of law, IRCL's motion for summary judgment is **GRANTED** and Defendants' counterclaims against it are **DISMISSED.**

### IV. COUNTERCLAIM DEFENDANTS EQUIPEMENTS PIERRE CHAMPIGNY LTD. AND PIERRE CHAMPIGNY'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants also named Equipements Pierre Champigny ("EPC") and Pierre Champigny in their counterclaim complaint, charging both with, *inter alia,* violations of federal and state RICO provisions. EPC and Champigny filed a motion for partial summary judgment.

Defendants allege that EPC and Champigny committed violations of 18 U.S.C. § 1962(a), which proscribes the investment

---

**6.** Plaintiff is a subsidiary of Clark Equipment Company, which is a subsidiary of Ingersoll–Rand Company, a New Jersey corporation. Ingersoll–Rand Company is a subsidiary of Ingersoll–Rand Holding Incorporated, which is a subsidiary of Ingersoll–Rand Global Holding Company Limited, which is itself a subsidiary of the Counterclaim Defendant, IRCL. Thus, Plaintiff is a subsidiary, five times removed, of IRCL.

of money derived from racketeering activity; § 1962(c), which makes it illegal to conduct an enterprise through a pattern of racketeering activity; and § 1962(d), which applies to conspiracy to violate other provisions of § 1962. As a predicate offense, Defendants allege that EPC and Champigny participated with Plaintiff in acts of extortion in violation of the Hobbs Act. Specifically, Defendants assert that Plaintiff, EPC, and Champigny conspired to end CCQ's distributorship in favor of EPC.

## A. *Sufficiency of Pleading RICO Claims*

As stated in Section II.A of this Order, Defendants' counterclaim is deficient insofar as it fails to allege the involvement of Plaintiff or either Counterclaim Defendant in an enterprise of racketeering activity. The "shotgun" nature of Defendants' counterclaim complaint dooms its federal RICO claims against Plaintiff and each Counterclaim Defendant regardless of the merits of any of those claims. *See Doxie v. Ford Motor Credit Co.,* 603 F.Supp. 624, 628 (S.D.Ga.1984) (recognizing importance of heightened pleading requirement in RICO claims). Thus, Defendants' federal claims against Champigny and EPC fail because they are pleaded insufficiently.

## B. *The Hobbs Act*

 The Hobbs Act forbids "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). As Defendants were unable to allege that Plaintiff obtained property from them, with their consent, by exploiting a fear of economic loss, Defendants likewise are unable to do so with regard to Champigny and EPC.

As the Court notes above, Defendants allege that an oral contract for distribution of used golf carts was reached in 1998.

Under O.C.G.A. § 13–5–30, an oral contract that will not be performed in one year is not enforceable. *See Yarborough v. Hi–Flier Mfg. Co.,* 63 Ga.App. 725, 728, 12 S.E.2d 133, 135 (1940) (holding that oral distributorship contract intended to run from year to year was not enforceable under statute of frauds). Thus, any oral agreement reached in 1998 would have expired under the statute of frauds before the alleged acts of extortion. With regard to the contractual distributorship agreements for new golf carts and parts, the agreements were renewed frequently with the final one expiring on September 1, 2000. Thus, Defendants cannot assert that any subsequent agreement between Plaintiff and Champigny or EPC deprived them of an enforceable property right under an existing contract.

Defendants also fail to assert that contractual property rights were taken with their consent, as required under the Hobbs Act. 18 U.S.C. § 1951(b)(2) (forbidding "the obtaining of property from another, *with his consent,* induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right"). In their counterclaim complaint and RICO statement, Defendants consistently accuse Plaintiff and Counterclaim Defendants of "unilaterally" depriving them of contract rights. Def. Counterclaim Compl. ¶ 260; RICO Statement at 2, 9. Defendants nowhere allege that any property rights were taken from them with their consent.

Defendants' extortion claim also is deficient for failure to cite cognizable fear of economic loss. The Eleventh Circuit has recognized that the fear of economic loss must be "separate and distinct" from fear associated with the prospect of the other party not performing under the contract. *Robert Suris Gen. Contractor Corp. v. New Metropolitan Federal Savings and Loan Assoc.,* 873 F.2d 1401, 1405 (11th Cir.1989). Extortion occurs when a party

to a contract fraudulently puts the other party in a position of financial risk in order to gain a concession at the time of performance of the contract. *E.g., Battlefield Builders v. Swango*, 743 F.2d 1060, 1063 (4th Cir.1984). Defendants have cited nothing other than an "implicit" threat of non-performance under contract, which is not enough to constitute cognizable fear of economic loss. Additionally, Defendants have not cited sufficient evidence showing that they possessed a legitimate fear of Plaintiff's non-performance. For these reasons, Defendants have failed to state a valid extortion claim against Champigny or EPC.

### C. Elements of RICO Law

As the Court found in Section II.C.1–4 of this Order, Defendants have failed to allege properly the elements of a RICO claim as set forth in 18 U.S.C. § 1962(a)-(d). Specifically, Defendants have not sufficiently alleged an investment injury or an acquisition injury, nor have Defendants distinguished between "enterprise" [7] and "person" [8] for purposes of § 1962(c).[9] Because Defendants' claims under § 1962(a)-(c) fail as a matter of law, their conspiracy claim under § 1962(d) also fails.

### D. Georgia RICO

The Court held in Section II.D of this Order that Defendants' claims under state

RICO law against Plaintiff fail as a matter of law because their asserted predicate acts fail. For the reasons stated therein, Defendants' claims against EPC and Champigny under state RICO law fail as well.

### E. Conclusion

For the foregoing reasons, the partial summary judgment motion filed by EPC and Champigny is **GRANTED**. Defendants' claims against EPC and Champigny pertaining to federal and state RICO charges are **DISMISSED**.

## V. DEFENDANT MURPHY'S MOTION FOR SUMMARY JUDGMENT

Defendant Murphy has filed a motion for summary judgment in which he alleges that he is not subject to personal jurisdiction in this Court. Murphy previously has raised this issue in a motion to dismiss. The Court issued Orders on February 15, 2001, July 26, 2001, and September 4, 2001, in which it found the exercise of personal jurisdiction proper.

 Georgia courts recognize a sharp distinction between the personal actions of a corporate officer and actions undertaken in their official capacity for purposes of determining whether a court may assert personal jurisdiction over that officer.[10]

---

7. See Section II.C.1 of this Order.

8. See Section II.C.2 of this Order.

9. See Section II.C.3 of this Order.

10. Georgia's long-arm statute is codified at O.C.G.A. § 9–10–91(1):

A court of this state may exercise personal jurisdiction over any nonresident or his executor or administrator, as to a cause of action arising from any of the acts, omissions, ownership, use, or possession enumerated in this Code section, in the same manner as if he were a resident of the state, if in person or through an agent, he:

(1) Transacts any business within this state;
(2) Commits a tortious act or omission within this state, except as to a cause of action for defamation of character arising from the act;
(3) Commits a tortious injury in this state caused by an act or omission outside this state if the tort-feasor regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state;

As the court in *Girard v. Weiss*, 160 Ga. App. 295, 297–98, 287 S.E.2d 301, 303 (1981), noted, an individual who does not have sufficient minimum contacts with Georgia under *International Shoe v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945), and progeny is not subject to personal jurisdiction in Georgia for actions taken within the state solely in his or her capacity as a corporate officer. Further, in *Harbin Enterprises, Inc., v. Sysco Corporation*, 195 Ga.App. 694, 696, 394 S.E.2d 618, 620 (1990), the Georgia Court of Appeals specifically refused to hold that a corporate officer waived personal jurisdiction by signing a contract with a forum selection clause when he signed the contract in his capacity as an officer for the corporation. The presence of a personal guaranty does not change that outcome. *Southern Electronics Distributors, Inc., v. Anderson*, 232 Ga.App. 648, 502 S.E.2d 257, 260 (1998); *see also, Apparel Resources International, Ltd. v. Amersig Southeast, Inc.*, 215 Ga. App. 483, 451 S.E.2d 113 (1994) (refusing to exercise personal jurisdiction over nonresident defendant whose only contacts with Georgia were her business dealings as corporate officer and personal guaranty she signed). Thus, in Georgia, the rule is that in order to assert personal jurisdiction over an individual whose dealings in the state have primarily been in his capacity as a corporate officer, the individual must have independent minimum contacts with the forum state that meet the due process standards established by *International Shoe. But see Stephens v. Entre Computer Centers, Inc.*, 696 F.Supp. 636, 639 (N.D.Ga.1988) (holding that forum selection clause is sufficient to establish personal jurisdiction over corporate officer).

 In its prior Order addressing Defendants' motion to dismiss, the Court found that Murphy possessed sufficient, independent minimum contacts in order to establish personal jurisdiction. Murphy perpetuated a business relationship with Plaintiff, which maintained its principal place of business and its manufacturing plant in Georgia, that lasted more than twenty years. Murphy negotiated contracts and agreements in Georgia, purchased products in Georgia, and maintained a distributorship relationship necessitating constant shipments from Georgia to Canada.

The Court finds this case analogous to *White House, Inc., v. Winkler*, 202 Ga.App. 603, 415 S.E.2d 185 (1992). In *White House*, the defendant, a California resident, was sued in his individual capacity for breach of an agreement to guaranty his incorporated business's debt. The defendant, as the principle officer of his corporation, contracted with the plaintiff to buy a large number of t-shirts and to execute a personal guaranty for payment. He failed to execute the guaranty and his corporation did not pay for the t-shirts. The Georgia Court of Appeals found that the trial court properly could exercise jurisdiction over the defendant even though he had never visited Georgia. *Id.* at 605, 415 S.E.2d 185. The court noted that the defendant, in the name of his bankrupt corporation, had done business with the Georgia plaintiff for several years, that the two

(4) Owns, uses, or possesses any real property situated within this state; or
(5) With respect to proceedings for alimony, child support, or division of property in connection with an action for divorce or with respect to an independent action for support of dependents, maintains a matrimonial domicile in this state at the time of the commencement of this action or, if the defendant resided in this state preceding the commencement of the action, whether cohabiting during that time or not. This paragraph shall not change the residency requirement for filing an action for divorce.

businesses had an ongoing relationship, that his actions were purposeful, and that the defendant created continuing personal obligations between himself and the plaintiff. *Id.* The Court of Appeals concluded "that [the defendant] was far from being a passive party ... but instead knowingly and 'purposefully did an act or acts and consummated a transaction or transactions within the state, so as to establish legally sufficient contacts.'" *Id.* (citing *Georgia R. Bank Co. v. Barton,* 169 Ga.App. 821, 824, 315 S.E.2d 17 (1984)); *see also Drennen v. First Home Savings Bank,* 204 Ga.App. 714, 420 S.E.2d 376 (1992) (holding that Alabama defendant who made personal guaranty to secure loans for business deal was subject to personal jurisdiction in Georgia because he purposefully conducted business in Georgia); *Autrey v. UAP/GA AG Chem, Inc.,* 230 Ga.App. 767, 497 S.E.2d 402 (1998) (holding that Florida defendant, who was president and shareholder of corporation and who executed personal guaranty for delinquent debts of corporation, was subject to personal jurisdiction in Georgia).

Likewise, Murphy here acted in a purposeful fashion, created continuing personal obligations between himself and Plaintiff on behalf of CCQ, and was far from being a passive party in CCQ's business dealings with Plaintiff. Thus, the Court again holds that Martin Murphy is subject to personal jurisdiction under the Georgia long-arm statute and the Due Process Clause of the United States Constitution.

Murphy cites no new evidence or arguments of law to support his summary judgment motion that were not previously raised in the motion to dismiss and subsequent motions to reconsider. For these reasons, the Court **DENIES** Murphy's summary judgment motion.

## VI. CLUB CAR QUEBEC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant, CCQ, has filed a motion for partial summary judgment on its counterclaims of money had and received, conversion, and breach of contract. The Court will address each issue in turn.

### A. *Money Had and Received*

 CCQ's claim for money had and received is predicated on its assertion that Plaintiff accepted QST payments from CCQ and did not remit immediately those payments to Quebec tax authorities. CCQ's right to recovery of funds submitted to Plaintiff depends on its "ability to show that [Plaintiff] would be unjustly enriched if allowed to retain the money." *Palmer v. Mitchell County Federal Savings and Loan Assoc.,* 189 Ga.App. 646, 377 S.E.2d 4, 7 (1988). A cause of action in money had and received is appropriate "where one wrongfully receives and retains the money of another." *J.C. Penney Co. v. West,* 140 Ga.App. 110, 112, 230 S.E.2d 66, 68 (1976). Thus, CCQ may only maintain an action against Plaintiff for money had and received if Plaintiff retains the money, and, thus, becomes unjustly enriched through CCQ's submission of QST payments.

Plaintiff has submitted evidence, however, indicating that it did remit CCQ's QST payments to Quebec authorities, albeit in a belated fashion, in the form of a check for $245,426.42 issued on June 6, 2001. Speering Aff. Ex. 5. A disputed issue of material fact exists as to whether Plaintiff has been enriched unjustly through CCQ's submission of QST payments. Thus, CCQ's motion for summary judgment on this issue fails.

## B. *Conversion*

■ CCQ also seeks summary judgment against Plaintiff on its claim for conversion of QST payments. The four elements of a conversion claim in the State of Georgia are (1) that the plaintiff have title or right of possession to the property in question, (2) that the defendant have actual possession of the property, (3) that the plaintiff demand for the property to be returned, and (4) that the defendant refuse to return the property. *Hooks v. Cobb Center Pawn & Jewelry Brokers*, 241 Ga. App. 305, 308, 527 S.E.2d 566, 569 (1999).

■ As the Court has noted, a material issue of disputed fact remains concerning whether Plaintiff has actual possession of the QST funds. More importantly, however, CCQ has not alleged that it demanded the return of its QST funds or that Plaintiff refused the demand. Thus, CCQ has not alleged facts to support three of the four elements of a cognizable conversion claim in Georgia.

CCQ's summary judgment motion on its conversion claim also fails because money is not the proper subject of a conversion lawsuit in Georgia. "[T]here can be no conversion action for money damages for money, because generally, money is not subject to a civil action for conversion." *Taylor v. Powertel, Inc.*, 250 Ga.App. 356, 359, 551 S.E.2d 765, 769 (2001) (finding that tax remissions are not a proper subject of conversion claim, but should be brought under theory of money had and received). Because CCQ does not assert that it demanded the return of the QST funds, because a disputed issue of material fact exists as to who is in possession of the funds, and because money is generally not a proper subject of conversion actions, CCQ's motion for summary judgment on this issue fails.

## C. *Breach of Contract*

■ Finally, CCQ moves for summary judgment on its claim that Plaintiff breached its contract with CCQ for sale of used golf carts. Under the contract, which was never memorialized in writing, CCQ was given a right of first refusal on all used golf carts sold by Plaintiff within its territory. If CCQ declined to purchase the carts, it would receive a $100 commission on each used cart sold in its territory. M. Murphy Dep. at 38. Ray Bentley, Plaintiff's national sales manager for Canada at the time, issued a letter to CCQ on July 24, 1997, in which he ended the arrangement as of December 31 of that year.

The used cart arrangement was indefinite in terms of duration. Courts have consistently held that "a contract where duration is undeterminable is unenforceable." *OfficeMax, Inc. v. Sapp*, 132 F.Supp.2d 1079, 1085 (M.D.Ga.2001); *Williams v. Wright*, 783 F.Supp. 1392, 1398 (S.D.Ga.1992); *Parks v. Atlanta News Agency, Inc.*, 115 Ga.App. 842, 844, 156 S.E.2d 137, 139 (1967). Additionally, under O.C.G.A. § 13–5–30, an oral contract that will not be performed in one year is not enforceable. *See Yarborough v. Hi–Flier Mfg. Co.*, 63 Ga.App. 725, 728, 12 S.E.2d 133, 135 (1940) (holding that oral distributorship contract intended to run from year to year was not enforceable under statute of frauds). If the contract was intended to run for more than one year, the statute of frauds required it to be memorialized in writing in order to be enforceable. Thus, the used golf cart agreement was not enforceable as a matter of law because of its indefinite duration and failure to satisfy the statute of frauds.

Even if the contract were enforceable, Plaintiff had the prerogative to terminate it. "Where the contract provides for successive performances but is indefinite in duration, it is valid for a reasonable time

but unless otherwise agreed may be terminated at any time by either party." O.C.G.A. § 11–2–309; *see Jones v. Destiny Industries, Inc.,* 226 Ga.App. 6, 8, 485 S.E.2d 225, 227 (1997) (extending principle to non-U.C.C. context). Thus, even if the used golf cart agreement were an enforceable contract, it could have been terminated at any time by either party. In this case, Plaintiff gave CCQ five months notice of the termination of the agreement. Because the used cart agreement, even if it were enforceable, could have been ended by either party at any time, CCQ may not obtain summary judgment relief on its breach of contract claim. Instead, it appears that Plaintiff acted properly in terminating the arrangement.

### D. *Conclusion*

The Court has carefully considered the positions of CCQ and Plaintiff in CCQ's motion for partial summary judgment. For the foregoing reasons, the motion is **DENIED**.

### CONCLUSION

The Court **GRANTS** Plaintiff's motion for partial summary judgment. Defendants' federal and state RICO claims and its common law fraud claim against Plaintiff are **DISMISSED**. IRCL's motion for summary judgment is **GRANTED** and Defendants' counterclaims against it are **DISMISSED**. The partial summary judgment motion filed by EPC and Champigny is **GRANTED**. Defendants' claims against EPC and Champigny pertaining to federal and state RICO charges are **DISMISSED**. The Court **DENIES** Murphy's summary judgment motion. The Court **DENIES** CCQ's motion for partial summary judgment.